**Ernest J. NAGY, Plaintiff,**

**v.**

**David BISTRICER, Nachum Stein, Riblet Products Corporation, a Delaware corporation, and Coleman Cable Acquisition, Inc., a Delaware corporation, Defendants.**

**Civ. A. No. 18017.**

Court of Chancery of Delaware,
New Castle County.

Submitted: Nov. 15, 2000.
Decided: Nov. 22, 2000.

---

Andre G. Bouchard and Joel E. Friedlander, of Bouchard Margules & Friedlander, Wilmington, Delaware, for Plaintiff.

Anne C. Foster, J. Travis Laster, Michael J. Merchant, of Richards, Layton & Finger, Wilmington, Delaware; Dennis J. Block and Jason M. Halper, of Cadwalader, Wickersham & Taft, New York City, of counsel, for Defendants.

## MEMORANDUM OPINION

STRINE, Vice Chancellor.

This opinion resolves motions in a case involving an extremely unusual merger agreement. Defendants David Bistricer and Nachum Stein negotiated the merger agreement (the "Merger Agreement") between Riblet Products Corporation ("Riblet") and Coleman Cable Acquisition, Inc. ("Coleman Acquisition"). Bistricer and Stein are the controlling stockholders and directors of both Riblet and Coleman Acquisition. They signed the Merger Agreement on behalf of both companies. The Merger Agreement provided for Riblet to be the surviving company in a merger with a Coleman Acquisition subsidiary (the "Merger"). By their actions as the only directors and 85% stockholders of Riblet, Bistricer and Stein caused Riblet to agree to the Merger Agreement, without any

prior notice to the sole minority stockholder of Riblet, plaintiff Ernest Nagy.

The Merger Agreement stated that the stockholders of Riblet, including Nagy, would receive a tentatively set number of Coleman Acquisition shares in exchange for their Riblet shares. That tentative number could be adjusted upward or downward by the Coleman Acquisition board – the purchaser of Nagy's shares – upon the advice of an investment banker it selected. As an alternative to accepting the merger consideration, Nagy had the option of seeking appraisal. But the disclosures that were provided to Nagy in connection with his decision whether to seek appraisal or accept the merger consideration contained *no* information about why or how Bistricer and Stein had approved this strange Merger Agreement as Riblet directors, *no* financial information about Riblet or Coleman Acquisition, and no information regarding Bistricer's and Stein's interest in Coleman Acquisition. Moreover, Nagy was forced to choose whether to seek appraisal before he even knew definitively what the final merger consideration was. Indeed, Nagy did not learn what Coleman Acquisition had decided about the final merger consideration until the day the motions this opinion addresses were argued – a day well after Nagy had been required to file an appraisal petition.

Despite these undisputed facts, the defendants have moved to dismiss the complaint and have resisted Nagy's motion for summary judgment. In this opinion, I conclude on the basis of the uncontested facts that:

1) the defendants' argument that appraisal is Nagy's exclusive remedy is meritless under settled doctrine;

2) Nagy may press his unfair dealing and appraisal claims under one civil action number;

3) Bistricer and Stein breached their fiduciary duties by failing to even attempt to provide Nagy with disclosures that would permit him to make an informed judgment regarding whether to elect appraisal or accept the merger consideration;

4) Bistricer and Stein breached their fiduciary duties by abdicating their duty to approve definitive merger terms that were fair to Riblet's stockholders and by inequitably coercing Nagy into a forced appraisal;

5) defendant Coleman Acquisition is liable as an aider and abettor; and

6) the defendants have raised several arguments that are frivolous and that justify an award of attorneys' fees to Nagy under the bad faith exception to the American rule.

## I. *Factual Background*

### A. *The Parties*

Defendant Riblet Products Corporation is a closely-held corporation that manufactures power cords, wire assemblies, and bulk wire. Through its wholly-owned Oswego Wire, Inc. subsidiary, Riblet also manufactures bare and tinned copper and copper-clad steel wire products. Before the Merger, Riblet's stock was controlled by only three stockholders: defendant David Bistricer, defendant Nachum Stein, and plaintiff Ernest J. Nagy.

Defendant Coleman Cable Acquisition, Inc. is a Delaware corporation that was formed by Bistricer and Stein for the purpose of acquiring the stock of Riblet and the assets of Coleman Cable Systems, Inc. ("Coleman Cable"). Coleman Cable manufactures products used by the wire and cable industry.

Defendants Bistricer and Stein comprised the entire board of directors of Riblet before the Merger and together (with members of their families) owned 85% of Riblet's stock. Bistricer and Stein acquired control of Riblet in a 1986 leveraged buyout.

Bistricer and Stein also controlled Coleman Acquisition before the Merger. Bistricer and Stein were directors of Coleman Acquisition at that time, and they and their families own a majority of Coleman Acquisition's stock.

Plaintiff Nagy owned the other 15% of Riblet's stock before the Merger, having acquired his position in the 1986 leveraged buyout in which Bistricer and Stein acquired their majority stake. Nagy's involvement in Riblet, however, long predated that of the defendants. From 1975–1990, Nagy served as Riblet's Chief Executive Officer. In 1990, Nagy was terminated by defendants Bistricer and Stein. Nagy then filed suit and was awarded compensatory damages of over one million dollars for breach of his employment agreement.

### B. *The Merger*

The Merger between Coleman Acquisition and Riblet was effected pursuant to a merger agreement dated December 28, 1999 by and among Coleman Acquisition, Riblet, and a merger subsidiary formed by Coleman Acquisition. Riblet was the surviving corporation in the Merger with the merger subsidiary and ended up as a wholly-owned Coleman Acquisition subsidiary. The Merger Agreement was signed by Bistricer and Stein on behalf of all three corporations who were parties to the Merger Agreement. That is, Bistricer and Stein signed for both sides of the deal.

The Merger was not preceded by a vote of all the Riblet stockholders. Rather, Bistricer and Stein provided the necessary Riblet stockholder approval by executing written consents. The Merger was consummated on January 4, 2000.

The terms of the Merger Agreement setting forth the consideration to be paid to the Riblet stockholders were unusual. Although § 2.02(c) of the Merger Agreement provides that each share of Riblet stock is to be converted into 22.29 shares of Coleman Acquisition stock at the time of the Merger (the "Tentative Merger Consideration"), that level of consideration was provisional only. The Merger Agreement required Coleman Acquisition's board of directors to "retain an independent investment bank to provide the Board of Directors of [Coleman Acquisition], within 60 days after [December 28, 1999], with a valuation of Riblet and advise as to its opinion on the fairness of the Merger Consideration, after which the Board of Directors of [Coleman Acquisition] may adjust the [Tentative] Merger Consideration in light of such valuation and advise [sic]." [1] Section 2.03 of the Merger Agreement provides that stockholders of Riblet who did not vote in favor of the Merger— i.e., Nagy—were entitled to seek appraisal pursuant to 8 *Del. C.* § 262.

Nagy was notified of the Merger after it had already been consummated. An "Information Circular and Notice of Appraisal Rights" (the "Information Circular") dated January 13, 2000 was sent to Nagy. The Information Circular identified the Tentative Merger Consideration and the fact that it could be adjusted by Coleman Acquisition's board. The Information Circular advised Nagy that he had until February 2, 2000 to submit an appraisal demand. That is, the appraisal demand was due before the final merger consideration had been determined.

Although the Information Circular contained a good deal of information about how to perfect appraisal rights and the nature of an appraisal proceeding under § 262, the Information Circular was wholly devoid of other material information. For example, the Information Circular contained no financial information regarding either Riblet or Coleman Acquisition. Nor did the Information Circular describe the process by which the Merger Agreement had been negotiated, the reasons the Riblet board had agreed to it, or Bistricer's and Stein's interests in Coleman Acquisition.

Put bluntly, the Information Circular contained no information from which Nagy could make any reasoned judgment regarding the monetary value of even the Tentative Merger Consideration he might receive or the value of the Riblet stock he was exchanging for that consideration. This omission is in addition to the obvious fact that the Tentative Merger Consideration was subject to downward adjustment by Coleman Acquisition after the time by which Nagy was required to decide whether to accept the merger consideration or seek appraisal.

### C. *Nagy Perfects His Appraisal Rights And Files This Suit*

Nagy demanded appraisal on January 26, 2000. On April 28, 2000, Nagy filed this action.

■ In his complaint, Nagy set forth the following counts:

- Count I—This count alleges that Bistricer and Stein breached their fiduciary duty of loyalty [2] by abdicating to

---

1. Comp. Ex. A § 2.02(c).

2. The complaint also refers to the so-called "duty of good faith." By definition, a director cannot simultaneously act in bad faith and loyally towards the corporation and its stock-

holders. *In re ML/EQ Real Estate Partnership Litig.*, Del. Ch., C.A. No. 15741, mem. op. at 9 n. 20, 1999 WL 1271885 at *4 n. 20, Strine, V.C. (1999). If it is useful at all as an independent concept, the good faith iteration's utility may rest in its constant reminder (1)

Coleman Acquisition, a corporation that they controlled and whose interests were adverse to those of Riblet in the Merger negotiations, the right to determine the amount of consideration the Riblet stockholders would receive. This same abdication is said to constitute a breach of the duty of care, because Bistricer and Stein structured the Merger so as to deprive themselves of the ability to make an assessment of the fairness of the consideration to be offered to Riblet stockholders in the Merger.

- Count II—This count alleges that Bistricer and Stein breached their duties of loyalty and care by failing to disclose to Nagy the information that was material to his decision whether to accept the merger consideration or to seek appraisal.

- Count III—This count alleges that Coleman Acquisition aided and abetted Bistricer's and Stein's breaches of fiduciary duty.

- Count IV—Count IV seeks an appraisal of the value of Nagy's Riblet shares pursuant to 8 *Del. C.* § 262 and the payment of fair value by Riblet.

The complaint seeks a variety of alternative remedies, including rescission of the Merger, rescissory damages, and a fair value appraisal award. The complaint also seeks to have the defendants pay Nagy's attorneys' fees.

D. *Coleman Acquisition Does Not Determine The Final Merger Consideration Until The Day Of Oral Argument On These Motions*

After Nagy's suit was filed, his counsel was provided with a copy of a July 21, 2000

fairness opinion and valuation prepared for Coleman Acquisition by Valuemetrics, Inc. (the "Valuation"). The Valuation recommended that Coleman Acquisition decrease the Tentative Merger Consideration from 22.29 to 20.3 shares of Coleman Acquisition stock for each share of Riblet.

*On the day of oral argument,* November 13, 2000, the court and Nagy were informed for the first time that the Coleman Acquisition board had decided to fix the merger consideration at the original 22.29 level.

## II. *The Pending Motions*

### A. *The Defendants' Motion To Dismiss*

The defendants move to dismiss Nagy's complaint on several grounds:

- First, the defendants contend that Nagy's exclusive remedy is appraisal and that he cannot maintain an equitable action for breach of fiduciary duty against them.

- Second, even if Nagy may bring equitable claims, the defendants argue that he cannot prosecute those claims under the same civil action number as his appraisal claim. Rather, defendants insist that Nagy must file separate actions and ask that they be consolidated.

- Third, the defendants contend that Nagy's disclosure claims are simply conclusory and do not state a claim.

- Fourth, the defendants contend that Nagy's claim that Bistricer and Stein breached their fiduciary duties by improperly delegating to Coleman Acquisition the ability to revise the Tentative Merger Consideration is dismissible because (a) Coleman Ac-

---

that a fiduciary may act disloyally for a variety of reasons other than personal pecuniary interest; and (2) that, regardless of his motive, a director who consciously disregards his

duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes.

quisition had not as of the time of briefing set the merger consideration and (b) the facts pled in the complaint do not support an inference that this approach to determining the merger consideration violated the fiduciary duties of care or loyalty.

- Fifth, Coleman Acquisition argues that the aiding and abetting claim against it must be dismissed because Nagy has neither pled a breach of fiduciary duty claim against Bistricer and Stein, nor pled facts demonstrating the knowing participation of Coleman Acquisition in any such breach.

- Sixth, the defendants seek to dismiss Nagy's claim for rescission or rescissory damages. In support of this argument, the defendants note that Nagy has not sought to expedite this action and that the Merger has been consummated, and contend that rescission is now impractical. They also claim that the plaintiffs have not pled facts that, if true, would justify the imposition of as severe a remedy as an award of rescissory damages.

### B. *Nagy's Motion For Summary Judgment*

Nagy responded to the defendants' motion to dismiss with a dispositive motion of his own. He contends that the undisputed facts demonstrate that: (1) Bistricer and Stein contracted away to Coleman Acquisition their fiduciary duty to negotiate a fair merger price; (2) Bistricer and Stein breached their fiduciary duties by failing to disclose any material financial informa-

tion to Nagy that would have enabled Nagy to make an informed decision whether to accept the merger consideration or seek appraisal; and (3) Coleman Acquisition aided and abetted the first of these breaches.

### III. *Legal Analysis*

### A. *Procedural Standards*

Although the defendants' motion to dismiss arises under Rule 12(b)(6) and Nagy's motion for summary judgment under Rule 56, the differences between the well-settled procedural standards that govern each motion are of little importance here.[3] There are no genuine disputes of material facts that bear on the outcomes of the motions before me. Both parties agree about the relevant facts. They simply disagree about the legal consequences of those facts. Thus, I will consider the parties' cross-motions simultaneously when they address identical issues.

### B. *Is Appraisal Nagy's Exclusive Remedy?*

The defendants rehash an argument that this court has rejected three times in the course of the last two years.[4] They contend that Nagy may not maintain an equitable action for breach of fiduciary duty because appraisal is his exclusive and fully adequate remedy.

In evaluating this argument, I start from the (later explained) premise that Nagy has stated substantial claims for breach of fiduciary duty "unrelated to

---

3. *See, e.g., Solomon v. Pathe Communications Corp.*, Del. Supr., 672 A.2d 35, 38 (1996) (setting forth the Rule 12(b)(6) standard); *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131, 1142 (1990) (setting forth the Rule 56 standard).

4. *Wood v. Frank E. Best, Inc.*, Del. Ch., C.A. No. 16281–NC, mem. op., 1999 WL 504779, Chandler, C. (1999); *Andra v. Blount*, Del. Ch., C.A. No. 17154, mem. op., Strine, V.C. (2000); *Turner v. Bernstein ("Turner II")*, Del. Ch., C.A. No. 16190, mem. op., 2000 WL 776893, Strine, V.C. (2000).

judgmental factors of valuation...." [5] These claims include that the Merger was a self-dealing transaction between corporations controlled by Bistricer and Stein that was designed to advantage their personal interests at the expense of Nagy. In effecting the Merger, Bistricer and Stein did not deploy any of the mechanisms traditionally used to protect minority stockholders and thus they will bear the burden to show that the transaction was entirely fair. Furthermore, Bistricer and Stein failed to provide Nagy with any material financial information regarding Coleman Acquisition or Riblet that would enable Nagy to judge whether the Tentative Merger Consideration was fair. Not only that, Bistricer and Stein delegated to Coleman Acquisition the right to adjust that consideration downward after the time by which Nagy had to seek appraisal, thus forcing Nagy to make his appraisal decision while in the dark about the ultimate price offered.

■ Given these allegations, it would be hasty to assume that Nagy may not be able to prove his entitlement to either rescission of the merger or rescissory damages. Similarly, if proven, the serious allegations that Nagy raises could possibly support an award of attorneys' fees under an established exception to the American Rule.[6] Thus, settled authority would seem to make clear that Nagy may bring an equitable action.[7]

In support of their argument that appraisal is the exclusive remedy in these unpromising circumstances, the defendants make two principal arguments: (1) because Bistricer and Stein held 85% of the Riblet stock and did not need Nagy's votes to consummate the merger, then the merger should be treated as if it arose under 8 *Del. C.* § 253 and thus appraisal should be the exclusive remedy; and (2) appraisal is a fully adequate remedy because Nagy's fiduciary duty claims can be considered within the appraisal proceeding. I will address these arguments in turn.

The defendants' first argument is remarkable in view of the Supreme Court's decision in *Cede I*.[8] In *Cede I*, the Supreme Court held that plaintiff Cinerama could pursue an equitable action at the same time it was pressing its pre-existing appraisal petition challenging a merger between a subsidiary of MacAndrews and Forbes Group Incorporated ("MAF") and Technicolor Incorporated ("Technicolor"). The merger followed the acquisition of 82% of Technicolor's shares by way of a tender offer by MAF. The price of the tender offer had been negotiated between MAF and Technicolor, which had retained distinguished counsel and investment bankers to assist it with the merger. The investment bank gave an opinion that the

---

5. *Rabkin v. Philip A. Hunt Chemical Corp.*, Del.Supr., 498 A.2d 1099, 1100 (1985).

6. Under recognized exceptions to the American Rule, a prevailing party may obtain an award of attorneys' fees if it demonstrates that the losing party engaged in bad faith conduct that increased the costs of the litigation or engaged in egregious pre-litigation conduct. *Arbitrium (Cayman Islands) Handels AG v. Johnston*, Del. Ch., 705 A.2d 225, 231 (1997), *aff'd*, Del.Supr., 720 A.2d 542 (1998).

7. *See, e.g., Rabkin*, 498 A.2d 1099; *Cede & Co. v. Technicolor, Inc. ("Cede I")*, Del.Supr., 542 A.2d 1182 (1988) (further history omitted); *Wood*, Del. Ch., mem. op.; *Andra*, Del. Ch., mem. op.; *Turner II*, Del. Ch., mem. op.; *see also Wacht v. Continental Hosts, Ltd.*, Del. Ch., C.A. No. 7954, mem. op. at 6, 9, 1986 WL 4492, Berger, V.C. (1986) (alleged disclosure violations in connection with merger stated claims that were not subject to dismissal on the grounds that the plaintiff's exclusive remedy is appraisal).

8. 542 A.2d 1182.

price was fair.[9] At the time the agreement was negotiated, MAF did not control Technicolor. After MAF acquired its majority stake, it then caused the consummation of a back-end merger using its own newly acquired voting power. The back-end merger price was the same price that had been offered in the negotiated tender offer.

During the course of its appraisal action, plaintiff Cinerama came across evidence that led it to believe that the merger had been tainted by breaches of fiduciary duty and that the merger may have been illegal under Technicolor's certificate of incorporation.

The Supreme Court held that the Chancellor was correct in allowing Cinerama to pursue its equitable action for breach of fiduciary duty. In so holding, the Court emphasized the distinctions between the limited purpose and focus of an appraisal action under § 262 and the more sweeping claims and relief that could be pursued in an equitable action:

> In contrast to appraisal, entire fairness – fair price and fair dealing – is the focal point against which the merger transaction and consideration arrived at can be measured. *See Rabkin,* 498 A.2d at 1106 (unfair dealing claims, based on breaches of the duties of loyalty and care, raise "issues which an appraisal cannot address"); *Weinberger [v. UOP, Inc.,* Del.Supr.,], 457 A.2d [701,] at 714 [(1983)] ("[t]he appraisal remedy ... may not be adequate in certain cases, particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved"). It is important to emphasize that "the test for

fairness is not a bifurcated one as between fair dealing and price. *All aspects of the issue must be examined as a whole since the question is one of fairness."* [*Weinberger,* 457 A.2d] at 711 (emphasis added).

To summarize, in a section 262 appraisal action the only litigable issue is the determination of the value of the appraisal petitioners' shares on the date of the merger, the only party defendant is the surviving corporation and the only relief available is a judgment against the surviving corporation for the fair value of the dissenters' shares. In contrast, a fraud action asserting fair dealing and fair price claims affords an expansive remedy and is brought against the alleged wrongdoers to provide whatever relief the facts of a particular case may require. In evaluating claims involving violations of entire fairness, the trial court may include in its relief any damages sustained by the shareholders. *See Rabkin,* 498 A.2d at 1107; *Weinberger,* 457 A.2d at 713. In a fraud claim, the approach to determining relief *may* be the same as that employed in determining fair value under 8 *Del. C.* § 262. However, an appraisal action may not provide a complete remedy for unfair dealing or fraud because a damage award in a fraud action may include "rescissory damages if the [trier of fact] considers them susceptible of proof and a remedy appropriate to all issues of fairness before him." *Weinberger,* 457 A.2d at 714. *Weinberger* and *Rabkin* make this clear distinction in terms of the relief available in a section 262 action as opposed to a fraud in the merger suit.[10]

---

**9.** *See generally Cede & Co. v. Technicolor, Inc. ("Cede II"),* Del.Supr., 634 A.2d 345, 349–358 (1993) (further history omitted).

**10.** *Cede I.* 542 A.2d at 1187–88 (emphasis in original).

The Court then went on to hold that Cinerama could pursue both its appraisal and unfair dealing claims through trial, and could take advantage of the remedy it obtained that was most favorable to it, subject to the limitation that it could not obtain a duplicative recovery.[11] Thus, the mere fact that MAF had 82% of Technicolor's stock and thus the power to impose the back-end merger on Cinerama was not thought by the Supreme Court to be a justification for relegating Cinerama to the exclusive remedy of appraisal. In a subsequent opinion in the case, *Cede II*, the Supreme Court reiterated its view that Cinerama was not limited to appraisal.[12]

■ Recently, this court has held in three cases that appraisal was not the exclusive remedy for plaintiffs challenging the fairness of appraisal-eligible mergers effected by the votes of stockholders holding a super-majority of the shares. In *Wood v. Frank E. Best, Inc.*,[13] for example, Chancellor Chandler carefully reviewed the Supreme Court authority bearing on the question of when appraisal is an exclusive remedy.[14] His conclusion as to the current state of the law emerging from that caselaw bears repetition:

> The plaintiffs have alleged that the individual defendants stood on both sides of the cash out merger, timed the merger so as to minimize cost to themselves at the expense of the shareholders, and failed to provide any method for determining whether the merger was entirely

fair to the shareholders independent of the defendants themselves or their financial advisors whom they had hired. They claim that the resulting price was unfair, and that they were damaged as a result. Under *Cede* and *Rabkin* this states a claim sufficient to survive a motion to dismiss, and sufficient to put the defendants to proof that the transaction was entirely fair.

The defendants argue that, in addition to alleging breach of fiduciary duty, to survive a motion to dismiss the plaintiffs must demonstrate that appraisal is an inadequate remedy, either because deception or fraud misled shareholders into failing to pursue appraisal, or because damages available in an appraisal would be inadequate. It is defendants' view that a demonstration of the inadequacy of an appraisal action is the hurdle which plaintiffs must clear before pursuing this equitable remedy. For good or ill, however, as *Cede* makes clear, a colorable allegation of breach of entire fairness is sufficient to proceed with an equitable entire fairness action, despite the availability of appraisal as an alternative remedy....

The current state of our corporation law is that where, as here, cashed out minority shareholders have plead facts sufficient to indicate a breach of fiduciary duty, which they seek to bring against not only the surviving corporation but against individual directors or majority

---

11. *Id.* at 1191–92.

12. *Cede II*, 634 A.2d at 367. In that opinion, the Court reversed Chancellor Allen's decision that Cinerama could not recover more than the fair value of its stock in its unfair dealing case, stating that: "Under *Weinberger*'s entire fairness standard of review, a party may have a legally cognizable injury regardless of whether the tender offer and cash-out price is greater than the stock's fair value as determined for statutory appraisal purposes." *Id.*

In support of that proposition, the Court cited one of its previous decisions in the following blunt way, "*Rabkin v. Philip A. Hunt Chemical Corp.*, Del.Supr., 498 A.2d 1099, 1104 (1985) (appraisal not exclusive remedy)." *Id.* *Cede II*'s reading of *Rabkin* is consistent with the approach since taken by this court.

13. Del. Ch., mem. op., 1999 WL 504779.

14. *Id.* at 9–15, 1999 WL 504779.

shareholders as well, the plaintiffs need not demonstrate inadequacy of the appraisal remedy to survive a motion to dismiss.[15]

This court subsequently followed the same approach as *Wood v. Frank E. Best, Inc.*[16] in its decisions in *Andra v. Blount*[17] and *Turner II.*[18] In those cases, the court held that the plaintiffs were not relegated to an exclusive appraisal remedy, even though in each instance the merger under challenge had been consummated solely by the voting power of the defendants.

As a purely factual matter, therefore, it is clear that the Supreme Court and the Court of Chancery have yet to recognize the "nearly within § 253" rationale for appraisal's exclusivity that the defendants now urge upon me. More important, however, there is no apparent logic that justifies judicial acceptance of the rule the defendants proffer.

■ In so concluding, the court will not belabor points dealt with at some length recently in *Wood, Andra,* and *Turner II.* Suffice it to say that the reasoning of those cases is inconsistent with the defendants'

novel contention that a plaintiff who has stated viable claims of unfair dealing in connection with a § 251 merger may be relegated to an appraisal simply because the defendants' ownership interest approached the 90% level necessary to effect a § 253 merger. The reason why a plaintiff may not attack a "pure"[19] § 253 merger in a garden variety unfair dealing action is simple: allowing such an attack would be inconsistent with the procedure-free merger method contemplated by § 253 because it would, as a practical matter, require corporations to employ procedural fairness mechanisms in order to avoid liability under the entire fairness standard.[20] This rationale is inapposite in the context of a § 251 merger, especially a self-dealing merger like the one at issue here, which is also subject to § 144.[21]

Indeed, how can one reconcile the Supreme Court's determination in *Cede I* and *Cede II* that Cinerama could pursue an unfair dealing claim attacking a third-party two-step merger accomplished at a price blessed by a reputable investment bank with a conclusion that Nagy may not pur-

---

15. *Id.* at 12–15, 1999 WL 504779.

16. Del. Ch., mem. op., 1999 WL 504779.

17. Del. Ch., mem. op., 2000 WL 354387.

18. Del. Ch., mem. op., 2000 WL 776893

19. By a pure § 253 merger, I refer to a § 253 merger that is not part of an integrated transaction that is appropriately subject to challenge under the entire fairness standard. An example of an impure § 253 merger would be a transaction that had as its first step a tender offer and as its announced second step a cash-out merger to be effected by the acquiror if it purchased a control block of shares in the tender offer. *See Andra,* Del. Ch., mem. op. at 24 n. 30, 2000 WL 354387 at *11 n. 30..

20. *In re Unocal Exploration Corporation Shareholders Litig.,* Del. Ch., C.A. No. 12453,

op. at 35, 2000 WL 823376, at *13, Lamb, V.C. (2000) ("To [apply the entire fairness test to a pure § 253 merger] would gut the short-form merger statute of its meaning. For better or worse, the legislature granted a 90% parent corporation the right to merge the subsidiary out of existence unilaterally and provided an appraisal remedy for the minority stockholders in each such instance. It is simply inconsistent with that grant of power to superimpose on its exercise, in every case, an analysis of the 'procedure' employed in fixing the terms of the merger."); *Andra,* Del. Ch., mem. op. at 24 n. 30, 2000 WL 354387 at *11 n. 30. (same reasoning).

21. Absent implicit modification by a statute like § 253, the terms of § 144 would suggest that a self-dealing transaction that falls within the statute's reach is voidable unless, at minimum, one of the statutory categories that creates an exception to voidability is satisfied.

sue his attack on a self-dealing merger that was effected without the use of any fairness mechanisms, without the disclosure of material financial information, and that delegated to the acquiror the final say on the consideration to be offered? Without minimizing the significance of Cinerama's claims in the Technicolor case, one can confidently say that Delaware permits Nagy no less of a chance than Cinerama was afforded to seek the more complete remedy that is available in an equitable action.

■ Of course, that statement is perhaps not at odds with the defendants' second argument, if one accepts their premise that Nagy may obtain as full a remedy in

an appraisal proceeding as in an equitable action. Unfortunately, the confidence with which this equivalency argument was raised in the defendants' briefs was not matched by binding concessions at oral argument, nor is that confidence supported by the case law.

To the contrary, it is clear that the sole remedy that will be available in an appraisal proceeding is a fair value award, out of which Nagy may recover his attorneys' fees and expenses.[22] Although in certain circumstances an appraisal proceeding will require the court to value breach of fiduciary duty claims, that is because those claims are part of the going concern value of the corporation whose entity value is being determined.[23] Put a bit differently,

---

22. 8 *Del. C.* § 262(h)–(j); *Cede I*, 542 A.2d at 1187.

23. *E.g., Bomarko v. Internat'l Telecharge, Inc.,* Del. Ch., C.A. No. 13052, mem. op., 1994 Del. Ch. Lexis 51, at *7, 1994 WL 198726, at *2, Berger, V.C. (1994) ("[B]reach of fiduciary duty claims that do not arise from the merger are corporate assets that may be included in the determination of fair value."); *Porter v. Texas Commerce Bancshares, Inc.,* Del. Ch., C.A. No. 9114, mem. op., 1989 Del. Ch. Lexis 130, at *18, 1989 WL 120358, at *5, Allen, C. (1989) ("If the company has substantial and valuable derivative claims, they, like any asset of the company, may be valued in an appraisal."); *In re Radiology Associates, Inc. Litig.,* Del. Ch., Cons. C.A. No. 9001, mem. op. at 33, 1990 WL 67839, Chandler, V.C. (1990) (same principle); *Francis I. duPont & Co. v. Universal City Studios, Inc.,* Del. Ch., 312 A.2d 344, 351 (1973) (for valuation purposes, reducing fees paid by the corporation whose shares were being valued because the fees were set in a self-dealing transaction and had not been shown to be fair); D.A. DREXLER, L.S. BLACK, JR. & A.G. SPARKS, III, DELAWARE CORPORATION LAW AND PRACTICE § 36.08[1][E] at 36–25 (1999) (hereinafter "DREXLER, BLACK & SPARKS") ("Where the corporate cause of action involves a reasonably readily ascertainable quantum of damages ... and the cause of action is clearly established in the record, the Delaware courts appear willing to include the

value of such a cause of action in determining the overall asset value.").

The fact that Nagy's fiduciary duty claims constitute a direct attack on the validity of the merger itself distinguishes this case from *Cavalier Oil Corp. v. Harnett,* Del.Supr., 564 A.2d 1137 (1989), upon which the defendants rely. In that case, the Supreme Court held that corporate opportunity claims (i.e., traditional derivative claims) could be valued in an appraisal proceeding under the "unusual facts" of that case in which all of the parties contemplated that the claims would be considered in the appraisal. 564 A.2d at 1143. In so ruling, the Supreme Court went out of its way to note that it was not undermining *Cede I's* teaching that "where allegations of fraud and breach of fiduciary duty exist in connection with a merger, an action separate and distinct from an appraisal proceeding may and indeed must be maintained." *Id.*

It is true that the Supreme Court also seemed to interpret *Cede I* as holding that claims belonging to the corporation may never be valued as an asset of the corporation in an appraisal because the appraisal petitioner loses derivative standing as a consequence of the merger. *Id.* But this dictum does not appear to be an accurate statement of the law and fails to take into account that the purpose of an appraisal is to provide stockholders who are no longer owners of the previous entity with their fair share of its value as a going concern as of the date of the merger. To the

because those claims are assets of the corporation being valued, the court must place a value on those assets in coming to a fair value determination.

The claims raised by Nagy are individual claims that directly relate to the fairness of the Merger. As *Cede I* held, these claims are not properly subject to valuation in the appraisal proceeding.[24] As such, the court could not permissibly hold Riblet, the surviving corporation in the Merger, responsible for paying damages as to those claims. To do so would be to broaden the statutory remedy beyond its legislatively established limits.[25]

At oral argument, the defendants admitted as much by refusing to concede that an award of rescissory damages could be made against Riblet in the context of an appraisal proceeding because of any breaches of fiduciary duty by Bistricer, Stein, and their alleged aider and abettor, Coleman Acquisition, in connection with the Merger. Moreover, the defendants also refused to concede that Riblet could be forced to pay Nagy's attorneys' fees if Nagy proved that Bistricer's, Stein's, and Coleman Acquisition's conduct justified such an award under exceptions to the American Rule.

The defendants' refusal to concede these points was sound in view of the established limits of a § 262 proceeding. But this refusal logically undercuts the defendants' simultaneous contention that appraisal is an adequate substitute for an equitable action.

Only in an equitable action can Nagy possibly obtain rescission or rescissory damages. Only in an equitable action can Nagy secure an award of attorneys' fees based on the alleged bad faith conduct of Bistricer, Stein, and Coleman Acquisition. Because Nagy may not receive a full remedy for the harm he allegedly suffered as a result of the defendants' conduct unless he is permitted to pursue his equitable action, the teaching of our Supreme Court makes clear that he cannot be relegated solely to the remedy of appraisal.[26]

C. *Must Nagy File Two Separate Complaints If He Wishes To Pursue Both An Action For Appraisal And An Equitable Action For Breach Of Fiduciary Duty?*

The defendants make an argument that would perplex first-year law students newly schooled in modern rules of civil procedure that are designed to avoid complexity and formality where unnecessary to the fair and efficient procession of litigation. According to the defendants, Nagy may not combine in one complaint his appraisal and breach of fiduciary duty claims. The defendants concede that those claims may be pressed simultaneously (if appraisal is not Nagy's exclusive remedy) and most likely should be consolidated for purposes of pre-trial discovery and trial itself.

extent that the entity possessed valuable legal claims, the value of those claims is part of the overall value of the entity, a reality recognized in *Bomarko* and other cases.

**24.** *Cede I,* 542 A.2d at 1189 ("A determination of fair value does not involve an inquiry into claims of wrongdoing in the merger.").

**25.** *Id.* at 1187 (In an appraisal, the "only litigable issue is the determination of the value of the appraisal petitioners' shares on the date of the merger, the only party defendant is the surviving corporation and the only relief available is a judgment against the surviving corporation for the fair value of the dissenters' shares.").

**26.** *E.g., Andra,* Del. Ch., mem. op. at 26, 2000 WL 354387 at *9 (citing the *Cede* case as an example of the "substantially greater weight the Supreme Court has given to a full remedy of fiduciary breaches than to considerations of judicial economy or litigation efficiency" in the context of deciding whether appraisal is an exclusive remedy).

The defendants must also admit that Nagy has not argued his claims in a manner that fails to appreciate the important procedural and substantive differences between the two causes of action. Thus, Nagy recognizes that Riblet is the only defendant to his appraisal count. Meanwhile, defendants Bistricer and Stein are the defendants to the breach of fiduciary duty counts, with Coleman Acquisition being named as a defendant on the basis of its alleged status as an aider and abettor of the asserted breaches.

Given these realities, it is not clear what substantive purpose is served by the assertion of this argument, other than to proliferate complaints and increase court costs.[27] To give the defendants their due, however, their argument is not without support in precedent.

In *Cede I*, the Delaware Supreme Court held that it was an abuse of discretion for this court to refuse to consolidate unfair dealing and appraisal claims brought by plaintiff Cinerama arising out of the same merger for purposes of trial.[28] In the same opinion, however, the Supreme Court held that this court had not abused its discretion in refusing to permit Cinerama to amend its petition for appraisal to add its claims for breach of fiduciary duty.[29]

The Court stated its reasoning as follows:

As previously noted, statutory appraisal is limited to "the payment of fair value of the shares ... by the surviving or resulting corporation." 8 *Del. C.* § 262(i). A determination of fair value does not involve an inquiry into claims of wrongdoing in the merger.... In contrast, in a fraud action seeking monetary relief for unfair dealing, the focus of the suit is whether wrongdoing can be established, *see Weinberger*, 457 A.2d at 714. Hence, the necessary party defendants in a "fraud in the merger" action are the alleged wrongdoers because it is they who arguably caused the injury and should pay any damage award. To permit Cinerama to amend its statutory appraisal action to include its fraud claims would impermissibly broaden the legislative remedy. It would also fail to bring before the Court the necessary parties for the fashioning of any appropriate relief for a fraud.

Finally, to judicially expand an appraisal proceeding to include unfair dealing claims would likely create unforeseeable administrative and procedural problems for litigants and the courts. In most cases only a small proportion of shareholders will have perfected appraisal rights and thus have access to the expanded appraisal remedy.... If shareholders are permitted to litigate fraud claims in appraisal proceedings, shareholders not seeking appraisal would be required to litigate "entire fairness" claims identical to the claims litigated by shareholders with perfected appraisal rights but through separate actions. This would create a substantial risk of

---

27. At oral argument, the defendants conceded there was no logic to their request but that there could be a substantive effect if the request was granted. Apparently, the defendants believe that if the complaint is tainted by the inclusion of non-appraisal claims, then Nagy may be barred from pursuing appraisal because he would not have filed an untainted appraisal petition within the statutory deadline. This hyper-technical, capital punishment approach to procedure harkens back to the approach of English law courts that in part inspired the creation of what became the English Court of Chancery. Needless to say, it is not one that this court of equity embraces.

28. 542 A.2d at 1192.

29. *Id.* at 1189–90.

inconsistent judgments and raise issues of collateral estoppel. . . .

On the several grounds stated, we conclude that the Court of Chancery *did not abuse its discretion* in denying Cinerama's motion to amend its appraisal action.[30]

The defendants contend that *Cede I* states an inflexible rule that a complaint may never raise both an appraisal and a breach of fiduciary claim. Although the language of the opinion arguably supports such an interpretation, the court does not read the opinion the same way.

In this case, there is no distinction in identity between those plaintiffs seeking appraisal and those raising equitable claims. Thus, *Cede I's* concern that the defendants might be subjected to two separate entire fairness actions and thus any risk of inconsistent judgments is not relevant here.[31]

Moreover, because Nagy has been precise in his approach, there is no chance that the case will proceed without necessary parties before the court or that the case will subject defendants to improper forms of liability.[32] *Cede I* teaches that Nagy may proceed with his appraisal and equitable claims through a consolidated trial. As the court has since done in the *Technicolor* litigation, the court in this case is prepared to apply to the different claims that Nagy raises the different rules of law that uniquely apply to each. This is hardly a novel task for this court; it is one that the court is expected to perform in many of its cases.[33] The court has no intention to grant Nagy relief on his appraisal count that is more substantial than the statute authorizes, and fails to appreciate how the fact that this dispute will proceed under one complaint, rather than under the rubric of two consolidated complaints, "would impermissibly broaden the legislative remedy [of appraisal]."[34]

In this particular case, it would disserve judicial and litigative efficiency to require separate complaints. If such complaints were filed, their filing would inevitably be followed by requests to consolidate the separate cases before a single judge and for consolidated pre-trial and trial proceeding, a là *Cede I*. I fail to see any basis in law for exacting an additional filing fee from Nagy when no fathomable justification exists for requiring the filing of a new pleading with a separate civil action num-

---

**30.** *Id.* (emphasis added and other citations omitted).

**31.** To be candid, there are tools that can manage this risk and that are used in situations where multiple class actions are pending in different courts. It is not clear to me why this risk is enhanced by allowing joinder of an appraisal and breach of fiduciary duty claims in this same complaint as opposed to allowing them to proceed simultaneously in separate actions that are consolidated for purposes of trial.

**32.** This distinguishes this case from *Neal v. Alabama By-Products Corp.*, Del. Ch., C.A. No. 8282, mem. op., 1990 WL 109243, Chandler, V.C. (1990). In that case, the plaintiffs attempted to hold the surviving corporation directly liable for unfair dealing by the board of directors of the company whose stockholders were cashed-out in the merger. Although the court tried the plaintiffs' unfair dealing and appraisal claims *together*, it concluded that the plaintiffs could not obtain relief on their unfair dealing claims because none of the directors whose alleged misconduct was at issue were parties to the litigation. The court held that the plaintiffs could not impose liability on the surviving corporation for harm caused by the unfair dealing of non-parties because that would expand the remedy afforded by the appraisal statute, which was limited to a fair value award against the surviving corporation. *Id.* at 6–12, 1990 WL 109243.

**33.** *Cf.* Ct. Ch. R. 18(a).

**34.** *Cede I*, 542 A.2d at 1189.

ber. Therefore, the court denies defendants' motion to dismiss on this ground.

D. *Is Nagy Entitled To Summary Judgment On His Claim That Bistricer And Stein Breached Their Duty To Disclose All Material Facts Bearing On Whether Nagy Should Accept The Merger Consideration Or Seek Appraisal?*

■ Nagy and the defendants join issue over his disclosure claim. The defendants claim that Nagy has failed to even state a disclosure claim. Meanwhile, Nagy contends that the undisputed facts in the record demonstrate his entitlement to summary judgment on his disclosure claim. Nagy is correct. He is entitled to summary judgment and the defendants' argument that he has failed to even state a claim is frivolous.

Earlier this year, this court dealt with a case similar to this one. In *Turner II*,[35] a merger had been accomplished without a vote of the stockholders. The information subsequently sent to the minority stockholders advising them about their appraisal rights failed, however, to set forth virtually any of the material facts that were necessary to enable the minority stockholders to make an informed judgment whether to accept the merger consideration or seek appraisal.

This court concluded that the defendants' failure to make any genuine attempt to inform the minority stockholders of the material facts justified the entry of summary judgment for the plaintiffs, stating:

> Without belaboring the obvious, the defendant directors did not discharge

their obligation to provide the GenDerm stockholders with "the available material facts that would enable them to make an informed decision ... whether to accept the merger consideration or demand appraisal." The record is clear that the defendant directors defaulted on this obligation and did not even attempt to put together a disclosure containing any cogent recitation of the material facts pertinent to the stockholders; choice. Furthermore, GenDerm did not have a certificate of incorporation that included an exculpatory provision immunizing the defendant directors from liability for the breach of the duty of care.

Given the absence of evidence that the defendant directors made any attempt to comply with their disclosure obligations, it is clear that a due care violation has been demonstrated even under the exacting gross negligence standard. Because such a violation will suffice to establish liability for monetary liability, there is no need for the plaintiffs to produce evidence that the failure of disclosure was purposeful or otherwise indicative of disloyalty.[36]

■ The court's opinion in *Turner II* relied upon settled law, which requires that corporate directors provide stockholders with "all material facts within their control that a reasonable stockholder would consider important" in deciding whether to seek appraisal or accept the merger consideration.[37] The Delaware Supreme Court reaffirmed this long-settled principle of law as recently as this year, in

---

**35.** Del. Ch., mem. op., 2000 WL 776893.

**36.** *Id.* at 24–25, 2000 WL 776893 at *10 (*quoting Turner v. Bernstein ("Turner I")*, Del. Ch., C.A. No. 16190, mem. op. at 16, 1999 WL 66532, Jacobs, V.C. (1999)).

**37.** *Id.* at 24, 2000 WL 776893 at *10 (*quoting Skeen v. Jo–Ann Stores*, Inc., Del.Supr., 750 A.2d 1170, 1171 (2000)).

its decision in *Skeen v. Jo–Ann Stores, Inc.*[38]

Like the disclosures at issue in *Turner II*, the Information Circular provided to Nagy was wholly devoid of material facts bearing on the choice that Nagy was expected to make. As a result, Nagy's complaint and brief do not nit-pick around the edges; they forthrightly and accurately state that the information circular fails to contain any of the following material information: "[(a)] how the initial Merger consideration was determined, (b) any financial analysis of Riblet or Coleman Acquisition, either on a stand-alone or consolidated basis, (c) the factors [Bistricer and Stein] considered in entering into the Merger Agreement, and (d) the facts concerning their interests in Coleman Acquisition."[39] The defendants find fault with Nagy's claim, labeling it as conclusory and unsupported by any substantiation of his assertion that the omitted categories of information would have been material to the decision he had to make.

This argument is fatuous. The Information Circular contains *NO* information from which Nagy would have any idea of the value of Coleman Acquisition or Riblet. The Information Circular contains *NO* information regarding the reasons Bistricer and Stein supported the Merger as directors of Riblet, or the process that they used in coming to their decision to support the Merger. The Information Circular contains *NO* information regarding Bistri-

cer's and Stein's interest in Coleman Acquisition.

■ Information of this kind is self-evidently material to Nagy's decision whether to accept the merger consideration or to seek appraisal. The failure of Bistricer and Stein to provide Nagy with *ANY* information in these categories was a breach of their fiduciary duties. Given the absence of an exculpatory provision in the Riblet certificate of incorporation,[40] Bistricer and Stein may be held liable for damages, irrespective of their state of mind and their obvious status as interested directors. At the very least, the total lack of attention they paid to their disclosure duties merits a finding of gross negligence.[41] Thus, summary judgment is granted to Nagy on the disclosure Count II of his complaint, and the defendants' motion to dismiss that count is denied.[42]

E. *Is Nagy Entitled To Summary Judgment On His Claim That Bistricer And Stein Breached Their Fiduciary Duties By Delegating To Coleman Acquisition The Right To Set The Final Merger Consideration?*

■ As noted previously, the Merger Agreement provided that the Riblet stockholders would receive an amount of Coleman Acquisition shares that would be determined by the Coleman Acquisition board after it received the advice of an

---

38. 750 A.2d 1170.

39. Compl. ¶ 33.

40. *See* 8 *Del. C.* § 102(b)(7).

41. *Turner II*, Del. Ch., mem. op. at 25, 2000 WL 776893.

42. The defendants also argue that Nagy might have possessed the material information he needed because he was Riblet's Chief Executive Officer in 1990, a decade ago. At oral argument, defendants' counsel admitted they have no basis to believe Nagy had the material information about Coleman Acquisition (or, for that matter, Riblet) that would have enabled him to make an informed decision whether to accept the changeable Tentative Merger Consideration. In this regard, the court also notes that the defendants have not offered any affidavits to oppose Nagy's summary judgment motion, not even a Rule 56(f) affidavit.

independent investment bank. As Nagy and the court were informed at oral argument for the first time, that consideration has now been set by the Coleman Acquisition board at the 22.29 shares of Coleman Acquisition that was contained in the Merger Agreement as the Tentative Merger Consideration that Riblet stockholders would receive if Coleman Acquisition chose not to change it.

Nagy argues that Bistricer and Stein breached their fiduciary duties and exceeded their statutory authority by consummating a merger agreement that permitted the acquiring company to adjust the merger consideration to be received by Riblet's stockholders. According to Nagy this was an impermissible delegation of Bistricer's and Stein's fiduciary duties to a party with interests adverse to Riblet's stockholders and a breach of 8 *Del. C.* § 251(b). On the undisputed facts, Nagy seeks summary judgment on this claim.

For their part, the defendants contend that Nagy is not only not entitled to summary judgment. They go further and contend that Nagy has not even stated a claim. Because at the time he made his motion the Coleman Acquisition board had not made its decision about the merger consideration, they earlier argued that Nagy's claim was unripe. They now contend that Nagy was not injured by the delegation to Coleman Acquisition because Coleman Acquisition did not change the level of consideration identified in the Merger Agreement.

Not only that, despite the facts that the Merger was a self-dealing transaction subject to the entire fairness standard and § 144 and was accomplished without any procedural protections for Nagy, the defendants contend that the complaint fails to plead facts supporting an inference of disloyalty.

Again, the defendants' position lacks any reasoned basis in law or logic. The Merger is clearly subject to the entire fairness standard with the burden of proof resting on Bistricer and Stein.[43] Bistricer and Stein each had a financial motive to effect the Merger on terms that were unfair to Nagy.[44] As directors of Riblet, Bistricer and Stein had the duty to enter into the Merger Agreement with Coleman Acquisition only if they concluded that the terms of the Merger Agreement were fair to the stockholders of Riblet. Under § 251 of the Delaware General Corporation Law, the Riblet board had to adopt a resolution declaring the advisability of the Merger and the Merger Agreement itself had to set forth the "terms of . . . the merger."[45]

While it is true that the terms of a merger agreement may be dependent "upon facts ascertainable outside of such agreement,"[46] that does not aid Bistricer or Stein here. Bistricer and Stein negotiated a Merger Agreement that enabled the board of the acquiring corporation to adjust the merger consideration upward or downward in its discretion. Although that discretion was loosely tethered to the advice of an investment bank, that bank itself was one that Coleman Acquisition could unilaterally select.

**43.** *Kahn v. Lynch Communication Systems, Inc.*, Del.Supr., 638 A.2d 1110, 1115 (1994).

**44.** Bistricer and Stein argue that they were treated "equally" in the Merger. Their buy-side interest would appear to render this argument at best highly suspect.

**45.** *See* DREXLER, BLACK & SPARKS § 35.04[1], at 35–7 (noting that this provision includes "the basic exchange ratios by which the securities of the constituents which are affected by the mergers are to be altered.").

**46.** 8 *Del. C.* § 251(b).

Bistricer and Stein essentially abdicated their duty to determine a fair merger price to the Coleman Acquisition board. This abdication is inconsistent with the Riblet board's non-delegable duty to approve the Merger only if the Merger was in the best interests of Riblet and its stockholders.[47]

In *Jackson v. Turnbull*, this court invalidated a merger agreement that guaranteed minority stockholders a certain level of cash consideration with the possibility of receiving a higher amount if an investment bank named in the agreement came up with a higher valuation.[48] Then Vice Chancellor, now Justice Berger, concluded that the board could not delegate the authority to set the merger consideration to a third party even in circumstances when that delegation of discretion could only produce a *higher* price for the minority stockholders.[49] Likewise, in the *Sealy Mattress Company* case, this court held that a board of directors "in carrying out its affirmative duty to protect the interests of the minority, could not abdicate its obligation to make an informed decision on the fairness of the merger by simply deferring to the judgment of the controlling stockholder. . . ."[50] Here, Bistricer and Stein abdicated their duties to negotiate and approve a firm and fair transaction to Coleman Acquisition and left Coleman Acquisition with the discretion to reduce the price to be paid to Riblet's stockholders.

Nor is their abdication rendered permissible by the fact that they controlled the Coleman Acquisition board. Bistricer and Stein had a duty to lock in a fair price to Riblet when they were wearing their hats as Riblet directors. Nagy was not required to rely upon Bistricer's and Stein's good graces as Coleman Acquisition directors to protect him.[51]

47. 8 *Del. C.* § 141(a), (c). The fact that a corporate board of a corporation incorporated before 1996 cannot even delegate to a committee of the board the authority to enter into a merger agreement, see 8 *Del. C.* § 141(c)(1), and that corporations created after that date may not delegate to committees the authority to approve any action required to be submitted to stockholders for approval (i.e., many mergers), 8 *Del. C.* § 141(c)(2), supports the proposition that a board may not delegate to its negotiating adversary the authority to set the most important terms of a merger.

48. Del. Ch., C.A. No. 13042, 1994 Del. Ch. Lexis 25, at *14, 1994 WL 174668 Berger, V.C. (1994), *aff'd*, Del.Supr., 653 A.2d 306 (1994) (ORDER). *See also Field v. Carlisle Corp.*, Del. Ch., 68 A.2d 817 (1949) (board of directors could not delegate the duty to determine the value of property the corporation was receiving in exchange for the issuance of stock).

49. *Jackson*, 1994 Del. Ch. Lexis at *14, 1994 WL 174668.

50. *Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.*, Del. Ch., 532 A.2d 1324, 1338 (1987). In *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 873 (1985), the Delaware Supreme Court stated that:

> In the specific context of a proposed merger of domestic corporations, a director has a duty under 8 *Del. C.* [§] 251(b), along with his fellow directors, to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders. Certainly in the merger context, a director may not abdicate that duty by leaving to the shareholders alone the decision to approve or disapprove the agreement. Only an agreement of merger satisfying the requirements of § 251(b) may be submitted to the stockholders . . . . (citations omitted).

If a director cannot negotiate a merger agreement with a firm price without an adequate basis to believe it to be fair, how can a director support a merger agreement that gives the buyer with whom the director's corporation is supposedly negotiating at arm's length the right to set the final price?

51. The fundamental principles that supported the Delaware Supreme Court's invalidation of the so-called "slow-hand" poison pill in

Equally unavailing is Bistricer's and Stein's argument that the Merger Agreement's delegation to Coleman Acquisition is irrelevant because Coleman Acquisition decided not to adjust the Tentative Merger Consideration *eleven months after the Merger was consummated.* Indeed, the fact that Coleman Acquisition was given the power to leave Nagy dangling in this way supports Nagy's additional argument that Bistricer and Stein structured the Merger in a manner that was inequitably coercive.

Bistricer and Stein forced Nagy to seek appraisal before Nagy even knew what the final merger consideration was (putting aside the fact that he had no financial information from which to assess the value of even the Tentative Merger Consideration). Moreover, although the Merger Agreement required Coleman Acquisition to obtain the investment banking opinion within sixty days of the Merger – a provision the Coleman Acquisition breached – it did not set any date by which Coleman Acquisition had to decide on the final merger consideration.

The behavior of the defendants left Nagy with no practical choice. Section 262 sets deadlines from the date of a merger by which stockholders must act to secure their rights to appraisal. These include a 20–day deadline for making a demand, a 60–day period in which to withdraw the demand as of right, and a 120–day period in which to file an appraisal petition.[52] Nagy did not know the final merger consideration as of the time any of these deadlines came and went.

Quickturn Design Systems, Inc. v. Shapiro, Del.Supr., 721 A.2d 1281 (1998), also buttress my conclusion that it was impermissible for Bistricer and Stein to delegate their fiduciary responsibility to set a fair merger price to a party whose interests conflict with the interests of Riblet's stockholders.

By leaving Nagy without any information about the value of Riblet or Coleman Acquisition, denying him knowledge of the final merger consideration, and leaving the determination of the final merger consideration to the party that was buying Nagy's shares, Bistricer and Stein exerted maximum pressure on Nagy to exercise the lesser of two non-optimal options: appraisal.

In an artificial sense, it can, I suppose, be said that Nagy was not inequitably coerced into making a decision unrelated to the economic merits of the Merger.[53] Because the economic merits of the Merger were entirely dependent on a decision to be made at a future time by Coleman Acquisition and on information that Bistricer and Stein did not share with him, Nagy's choice to seek appraisal could be seen as a rational decision to turn down a deal about which he knew nothing.

But the fact that Nagy made a rational choice in a ridiculous situation does not render Bistricer's and Stein's conduct less inconsistent with their fiduciary duties. Bistricer and Stein did not offer Nagy a choice between accepting the benefits of an adequately disclosed and negotiated merger, on the one hand, or the status quo, on the other. Rather, they made Nagy choose between accepting (1) uncertain merger consideration of unknown value that would be determined by the party purchasing his stock or (2) litigating an appraisal case. Therefore, Nagy was compelled to seek a statutory appraisal remedy because he was not provided with any other firm choice that had been offered to

52. *8 Del. C.* § 262(d)(2), (e), (k).

53. *Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1382–83 (1996).

him by fiduciaries who had blessed that choice as fair, as our law requires.

The defendants' attempt to make "lemonade" out of their coercion of Nagy, by arguing that through the Merger the defendants gave Nagy a right to appraisal and thus the opportunity for liquidity. The court is not aware of any provision in the Delaware General Corporation Law that provides a board with the ability to force a minority stockholder to accept the "gift" of an appraisal remedy without another concrete option. Rather, the minority stockholder must also be given the alternative of receiving firm merger consideration that, in the context of a § 251 merger, has been determined to be fair by the corporation's board of directors.

▮ For all these reasons, therefore, I conclude that summary judgment should be granted to Nagy on his claim that Bistricer and Stein breached their fiduciary duties in connection with the Merger Agreement. Because Bistricer and Stein controlled Coleman Acquisition and executed the Merger Agreement on its behalf and because the breach of fiduciary duty was so patently obvious, I also conclude that summary judgment should be entered against Coleman Acquisition as an aider and abettor subject to later proof that Nagy was injured by the fiduciary breaches. It is undisputed that Coleman Acquisition knowingly participated in Bistricer's and Stein's breach through their controlling stockholders and directors, who also happened to be Bistricer and Stein.[54]

The question of an appropriate remedy for this breach and the earlier-discussed disclosure breach must await an evidentia-ry hearing. Although the defendants would have me rule out the option of rescission now, they have provided me with no reasoned basis to conclude that such a remedy is impractical or unwarranted. Indeed, the record suggests that the Merger was simply an easily undone card shuffle involving two decks of cards controlled by Bistricer and Stein, the sole purpose of which might well have been to put pressure on Nagy to depart by way of an expensive appraisal proceeding.

Similarly, their argument that rescissory damages may not be appropriate lacks force. Bistricer and Stein have the burden to show that the Merger is entirely fair and have already fallen short of that standard. They had the economic motive to advantage themselves at the expense of Nagy and structured the Merger in a highly unusual and eyebrow-raising way. Rescissory damages therefore cannot be ruled out as a fitting remedy.

In order, however, to resolve these and other remedy issues promptly, the parties shall schedule a conference with the court at which time a prompt trial date will be set, a date which will be preceded by expedited discovery.

### F. *Is Nagy Entitled To An Award Of Attorneys' Fees In Connection With The Argument Of These Motions?*

▮ This court does not lightly award attorneys' fees under the bad faith exception to the American Rule. But the court must be prepared to do so where defendants have engaged in "bad faith conduct," which "unnecessarily prolonged or delayed [the] litigation" or "knowingly as-

---

**54.** That is, Nagy has shown: (1) that Bistricer and Stein were his fiduciaries; (2) that Bistricer and Stein breached their duties; and (3) that Coleman Acquisition knowingly participated in the breach through the actions of its controlling stockholders and directors, Bistri-cer and Stein. *See In re Santa Fe Pac. Corp. Shareholder Litig.*, Del.Supr., 669 A.2d 59, 72 (1995) (setting forth the elements of an aiding and abetting claim). Although damages is also an element, that will be taken up later in the case.

serted frivolous claims."[55] Otherwise, defendants with deep pockets will have no disincentive to exert undue pressure on less well-off plaintiffs to settle strong claims on the cheap simply because the plaintiffs cannot afford the costs necessary to pursue their claims to a final resolution.

In this case, I conclude that several of the defendants' arguments were advanced with no reasoned basis in law or logic and therefore frivolously and in bad faith. Those arguments had the effect of delaying the procession of this case and imposing needless expense on Nagy.[56] In particular, I refer to the defendants' argument that the complaint fails to state a disclosure claim or a claim for breach of fiduciary duty. In view of the clarity of the legal principles involved, it is difficult to fathom why these arguments were advanced.[57]

I also conclude that the defendants' "appraisal exclusivity" argument can be so labeled, in light of the guidance given by this court on four different occasions in the past year [58] and in light of the Supreme Court's decisions in *Cede I and Cede II*. Because there is no conceivable basis upon which the defendants could conclude that Nagy did not state a claim that might support an award of rescissory damages, settled law renders their exclusivity argument a baseless one. By contrast, the defendants' "separate complaints" argument has enough grounding in *Cede I* (if not in common sense) to escape the appellation of frivolous.

Nagy shall present the defendants with a summary of the fees and costs attributable to his attorneys' work in resisting the elements of the motion to dismiss I have identified as interposed in bad faith. The parties shall then present an order requiring the immediate payment of those amounts by the defendants.

Nagy has, of course, reserved his right to argue that all the fees and costs of this litigation should be shifted under exceptions to the American Rule, once the court has been presented with a full record regarding the defendants' conduct before and during the litigation.

## IV.  *Conclusion*

For the foregoing reasons, Nagy's motion for summary judgment against defendants Bistricer, Stein, and Coleman Acquisition is GRANTED; Nagy's motion for attorneys' fees against defendants Bistricer, Stein, and Coleman Acquisition is GRANTED IN PART and DENIED IN PART; and the defendants' motion to dismiss is DENIED. Nagy shall submit a conforming order, after approval as to form by the defendants.

---

55.  *Johnston v. Arbitrium (Cayman Islands) Handels AG*, Del.Supr., 720 A.2d 542, 546 (1998) (citations omitted).

56.  This effect was not inadvertently produced. This conclusion is buttressed by the defendants' unjustified refusal to respond to legitimate discovery requests. This behavior has already resulted in an award of attorneys' fees to Nagy after a bench ruling issued at oral argument.

57.  *Id.* at 546 (affirming fee shifting when a defendant "had no valid defense and knew it" yet still made meritless arguments and took steps to delay a remedy for the plaintiff).

58.  This guidance was principally given in the *Wood, Andra,* and *Turner II* decisions cited *supra*. But the *Unocal* decision also touched on this issue and quoted *Wood's* description of the law as "well described." *Unocal*, Del. Ch., mem. op. at 30, 2000 WL 823376.