# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CYGNUS OPPORTUNITY FUND, LLC, | ) | |
| CYGNUS PROPERTY FUND V, LLC, | ) | |
| CYGNUS PROPERTY FUND IV, LLC, | ) | |
| CHAND KARAMCHANDANI, SHAMI | ) | |
| KARAMCHANDANI, ALEX | ) | |
| KEOLEIAN, K-BAR HOLDINGS, LLC, | ) | |
| and SHIKAR PARTAB | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0718-JTL |
| | ) | |
| WASHINGTON PRIME GROUP, LLC, | ) | |
| CHRISTOPHER CONLON, MARK | ) | |
| YALE, LISA INDEST, MARTIN REID, | ) | |
| JEFF JOHNSON, SUJAN PATEL, | ) | |
| PHILLIP L. HAWKINS, and STRATEGIC | ) | |
| VALUE PARTNERS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION ADDRESSING MOTION TO DISMISS

Date Submitted: May 10, 2023
Date Decided: August 9, 2023

John M. Seaman, Matthew L. Miller, Peter C. Cirka, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Counsel for Plaintiffs*.

Blake Rohrbacher, Ellen M. Boyle, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Andrew Ditchfield, Mari Grace Byrne, Tina Hwa Joe, Sean Stefanik, DAVIS POLK & WARDWELL LLP, New York, New York; *Counsel for Defendants Washington Prime Group LLC, Christopher Conlon, Mark Yale, Lisa Indest, Jeff Johnson, Sujan Patel, Phillip L. Hawkins, and Strategic Value Partners, LLC*.

Nicholas J. Rohrer, Lauren Dunkle Fortunato, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Erik J. Olson, MORRISON & FORRESTER LLP, Palo Alto,

California; Christina Golden Ademola, MORRISON & FORRESTER LLP, New York, New York; *Counsel for Defendant Martin Reid.*

**LASTER, V.C.**

The plaintiffs challenge a squeeze-out merger in which they were eliminated from a limited liability company by the company's controller and its board of managers (the "Squeeze-Out Merger"). The minority unitholders did not receive a vote on the Squeeze-Out Merger and did not have any right to obtain an appraisal.

At the price offered in the Squeeze-Out Merger, the plaintiffs' investment was worth nearly $34 million. The plaintiffs claim their units were worth up to four times that much.

The plaintiffs sued the controller, the managers, and three officers. The defendants moved to dismiss the complaint for failing to state a claim on which relief can be granted. This decision grants the motion in part.

## I. FACTUAL BACKGROUND

The facts are drawn from the complaint and the documents that it incorporates by reference. Dkt. 1 (the "Complaint"). At this procedural stage, the Complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.

## A. The Company Enters Bankruptcy.

Washington Prime Group, LLC (the "Company") is a fully integrated, self-managed REIT that owns, develops, and manages shopping centers. Before its reorganization in bankruptcy, the Company existed as a publicly traded Indiana corporation. The plaintiffs purchased common and preferred stock issued by that publicly traded corporation.

In fall 2020, the Company announced that it was negotiating with the holders of its unsecured senior notes (the "Senior Notes"). During the negotiations, Strategic Value Partners, LLC ("SVP") acquired a majority of the Senior Notes. SVP is an investment firm that specializes in distressed debt.

The Senior Notes would not mature until 2024. The Company's next regular payment was due in February 2021. The Company had more than enough cash on hand to make the payment. Nevertheless, shortly before the due date, the Company announced that it had elected to withhold the payment.

On June 11, 2021, the Company entered into a restructuring agreement with SVP and other creditors. The agreement contemplated a Chapter 11 filing with a plan of reorganization sponsored by SVP. Three days later, the Company filed for bankruptcy.

A group of preferred stockholders that included some of the plaintiffs formed an *ad hoc* committee to challenge the plan. They obtained some improvements, as did an official committee of equity holders.

On September 3, 2021, the Company emerged from bankruptcy as a privately held Delaware limited liability company. SVP controlled the firm with 87% of its equity. The former holders of the Company's preferred and common equity received 9% of its equity (the "Minority Unitholders"). Other former creditors received the rest.

B.     The Company's Governance Structure

In its post-bankruptcy incarnation, the Company's internal affairs are governed by its limited liability company agreement. Compl. Ex. A (the "LLC Agreement" or "LLCA"). The LLC Agreement creates a governance structure that mimics a corporation.

First, there is a board of managers (the "Board"). Like a board of directors, the Board has the authority to direct the "business and affairs of the Company" and "direct the officers of the Company[.]" *Id.* § 6.1(a). The Board currently has five members. The only limitation on its composition is that "so long as there are Owners other than SVP and its Affiliates,

2

there shall be at least one (1) Independent Manager on the Board." LLCA § 6.3(a). The LLC Agreement defines an "Independent Manager" as a

> Person who is neither an employee nor an Affiliate of the Company or of SVP or any of its Affiliates, and has no, and has had no, relationship with the Company or with SVP or with any of its Affiliates which is material to that Person's ability to be independent from the Company and SVP in connection with the duties as Independent Manager.

*Id.* § 1.1.

The members of the Board are Jeff Johnson, Sujan Patel, Christopher Conlon, Martin Reid, and Phillip L. Hawkins. Johnson and Patel work for SVP. Conlon is the CEO. Hawkins serves as Board Chair. Reid and Hawkins serve as Independent Managers. SVP can remove and replace any member of the Board at any time without cause.

Next, the LLC Agreement contemplates that the Company will have officers. As noted, Conlon serves as CEO. Mark Yale served as CFO until September 2022. Lisa Indest serves as Vice President of Finance and Chief Accounting Officer. All three held the same roles when SVP arrived on the scene and during the bankruptcy reorganization.

Furthering the corporate analogy, the LLC Agreement defines the Company's member interests as "Shares." There are three series of Shares: Series A-1 Shares, Series B-1 Shares, and Series C-1 Shares. The Minority Unitholders received Shares in the form of Stapled Units comprising one share from each series. The plaintiffs in this action received 1,246,724 Stapled Units.

## C. Restrictions On SVP's Ability To Acquire Additional Shares

The LLC Agreement places restrictions on SVP's ability to acquire additional Shares. It provides generally that "neither SVP nor its Affiliates shall engage in any

3

Transfer or other transaction to acquire (or otherwise squeeze out) all of the outstanding Shares (a 'Squeeze-Out') without approval as a Specified Approval." LLCA § 9.6(c) (the "No Acquisition Provision"). The LLC Agreement defines "Transfer" broadly as "a transfer by any Person" of any limited liability company interest "in any form." *Id.* § 1.1. The No Acquisition Provision thus prohibits SVP from increasing its ownership stake without Specified Approval.

Specified Approval comes in two flavors. One is approval from "the majority of the Independent Managers (whether or not acting as a Board Committee of Independent Managers)" ("Manager Approval"). *Id.* § 6.4. The other is approval from "a majority of the votes cast on the matter by Members other than SVP" ("Minority Approval"). *Id.*

Section 6.5 of the LLC Agreement, called the "Challenge Right," places additional restriction on SVP's ability to engage in a Squeeze-Out for eighteen months after the Company emerged from bankruptcy. *Id.* § 6.5. During that period, the Company first must give notice to the owners of the Stapled Units. At that point, holders of at least 5% of the Stapled Units "have the option to challenge the fairness of the terms of the . . . Squeeze-Out." *Id.* The lawsuit must be filed within twenty-one days after notice is provided. *Id.* In connection with any exercise of the Challenge Right, "the Company will pay or reimburse, as applicable, . . . reasonable and documented professional fees and expenses . . . subject to an aggregate cap of $500,000." *Id.*

The Challenge Right does not apply if (i) the Minority Unitholders' stake has fallen below 2.5% or (ii) the Squeeze-Out receives either Minority Approval or approval from the Minority Approved Independent Manager. The LLC Agreement defines the "Minority

4

Approved Independent Manager" is as "the Manager designated as such on Schedule IV, together with any replacement or successor Manager approved by a Majority of the Minority Vote." *Id.* § 1.1. Schedule IV identifies Reid as the initial Minority Approved Independent Manager.

The plaintiffs question Reid's ability to act as the Minority Approved Independent Manager and represent the interests of Minority Unitholders. Citing Reid's website and a court filing in another case, they allege that Reid makes his living by advising private equity funds and high-net-worth individuals on real estate investments. They maintain that because his livelihood depends on good relations with investors like SVP, he will go along with what SVP wants.

The LLC Agreement does not contain any mechanism for the Minority Unitholders to remove or replace any manager, including the Minority Approved Independent Manager. *See id.* § 6.3(b) (addressing manager removal and replacement). Only SVP has the authority to remove and replace managers, which it can do "with or without cause and for any reason or no reason at any time." *Id.*

**D.    The Tender Offer**

On November 9, 2021, nineteen days after the Company emerged from bankruptcy, SVP launched a tender offer to purchase the Stapled Units (the "Tender Offer"). Minority Unitholders who tendered on or before November 23 would receive $25.75 in cash per Stapled Unit. *See* Compl. Ex. H (the "Offer to Purchase"). After that date, Minority Unitholders who tendered would receive $25.00 in cash. SVP thus deployed a two-tiered, front-loaded structure.

5

The Tender Offer nominally sought to acquire up to 7,103,819 Stapled Units, which would take SVP's ownership stake to 95%, but SVP "reserve[d] the right, in [its] sole discretion, to purchase more than 7,103,819 Stapled Units in the Offer[.]" *Id.* at 10. It is reasonable to infer that SVP sought to own 100% of the Company's equity and that SVP would have acquired all of the Stapled Units if it could. To that end, SVP disclosed that it "may from time to time acquire Stapled Units, other than pursuant to the Offer, through open market purchases, privately negotiated transactions, exchange offers, exercise of optional redemption rights, offers to purchase or otherwise[.]" *Id.* at 19.

SVP acknowledged that the Tender Offer could be "considered a 'Squeeze-Out' as defined in the [LLC Agreement]" and disclosed that risk in the Offer to Purchase. *Id.* at 12. SVP did not obtain Specified Approval before proceeding with the Tender Offer. SVP also did not engage in the notice process contemplated by the Challenge Right.

SVP and the Board did not make any recommendation in connection with the Tender Offer. SVP disclosed that the consideration might not reflect fair value. No one provided any financial information to the Minority Unitholders.

The Tender Offer closed on December 8, 2021. Only 3,568,563 Stapled Units were tendered. SVP purchased those units and increased its ownership stake to 88.2%.

After the Tender Offer closed, plaintiff Shikar Partab asked one of the Company's officers for contact information for Reid, noting that he was designated in the LLC Agreement as the Minority Approved Independent Manager. In January 2022, the Company's outside counsel rejected that request and informed Partab that Reid was not

6

required to communicate with him. The Minority Approved Independent Manager thus gave the cold shoulder to a Minority Unitholder.

## E.     The Squeeze-Out Merger

Through a disclosure dated June 7, 2022, the Company informed the Minority Unitholders that each of their Stapled Units had been converted into the right to receive $27.25 in cash, without interest and with no right to an appraisal. That was the first time the Minority Unitholders heard about the Squeeze-Out Merger.

The disclosure consisted of a three-page cover letter and a skeletal, five-page information statement. Compl. Exs. C & D (collectively, the "Disclosure Documents").

According to the Disclosure Documents, SVP provided the Company with a proposal for the Squeeze-Out Merger on February 2, 2022, less than two months after the Tender Offer closed and only three and a half months after the Company emerged from bankruptcy. The Board responded to SVP's proposal by creating a special committee of one and appointing Reid as its sole member. The Disclosure Documents refer to unidentified legal and financial advisors who purportedly assisted Reid in negotiating with SVP. The Disclosure Documents did not describe the negotiations. It said that Reid received a fairness opinion from Jones Lang LaSalle Securities LLC ("JLLS"), but the Disclosure Documents did not include the opinion or provide a fair summary of its contents. The Complaint alleges that the Board Chair—Hawkins—previously worked for fourteen years at JLLS and has a son who is an executive vice president there. Although Hawkins is an Independent Director, he was not on the committee.

7

The consideration provided in the Squeeze-Out Merger was $27.25 in cash. That was 6% higher than the $25.75 per Stapled Unit offered in the first tier of the two-tiered tender offer, and 10% higher than the $25 consideration offered in the second tier. At $27.25 each, the plaintiffs' Stapled Units were worth nearly $34 million.

The Disclosure Documents asserted that because Reid approved the Squeeze-Out Merger, the Challenge Right did not apply.

**F.    One Of The Plaintiffs Requests Information.**

On June 8, 2022, Partab sought additional information from Company counsel. A lawyer responded on June 10. The email consisted of five sentences that did not answer Partab's questions and added nothing to the Disclosure Documents.

On June 22, 2022, plaintiff Cygnus Capital, Inc. formally demanded information about the Squeeze-Out Merger. The Company rejected the demand on the grounds that after the Squeeze-Out Merger, Cygnus no longer owned any interest in the Company and had no informational rights.

On June 28, 2022, after receiving the Company's annual report, Partab emailed two Company officers with questions. He received no response.

**G.    This Litigation**

On October 27, 2022, the plaintiffs filed the Complaint. They allege that the Squeeze-Out Merger dramatically undervalued the Stapled Units, and they have provided credible support for much higher valuations.

- A capitalization of net income methodology supports an estimate of $76 to 87 per Stapled Unit.

- Per-square-foot values based on sales of comparable properties support estimates of $60 per Stapled Unit.

- Replacement cost value supports an estimate of $120 per Stapled Unit.

- The Company's own website claims that the value of its assets are greater than $4 billion with another $1 billion of properties in the pipeline, suggesting an estimate of $60 per Stapled Unit.

In this action, they seek damages equal to the fair value of their Stapled Units.

The Complaint contains seven counts. Count I is directed at Conlon, Yale, and Indest (the "Officer Defendants"). The plaintiffs contend that the Officer Defendants breached their fiduciary duties as officers by failing to provide the Minority Unitholders with material information in connection with the Tender Offer and the Squeeze-Out Merger and by altering the Company's financial statements.

Count II is directed at the members of the Board. The plaintiffs contend that the Board members breached their fiduciary duties in connection with the Tender Offer by failing to provide the Minority Unitholders with material information. The plaintiffs assert that the members of the Board breached their fiduciary duties in connection with the Squeeze-Out Merger by approving an unfair transaction.

Count III is directed against SVP. The plaintiffs contend that SVP breached its fiduciary duties as a controlling unitholder based on allegations that track the claims against the Board.

Count IV asserts a claim against all defendants for breach of the express terms of the LLC Agreement. The plaintiffs contend that SVP breached the No Acquisition Provision by engaging in the Tender Offer and that other defendants failed to comply with

9

the Challenge Right. They also contend that the defendants breached Section 11.1(b) of the LLC Agreement, which provides members with informational rights.

Count V asserts a claim against all defendants for breach of the implied covenant of good faith and fair dealing. The plaintiffs contend that the defendants violated the implied covenant by engaging in the Tender Officer and the Squeeze-Out Merger and by denying them information.

Counts VI and VII asserts claims against the members of the Board and SVP for aiding and abetting the breaches of fiduciary duty by the Officer Defendants.

## II.     LEGAL ANALYSIS

The defendants moved to dismiss the Complaint in its entirety under Rule 12(b)(6) for failing to state a claim on which relief can be granted. When reviewing such a motion, a Delaware court must "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

### A.     Counts II and III: Breach Of Fiduciary Duty Against The Board And SVP

Counts II and III of the Complaint are the easiest to address. In those counts, the plaintiffs assert that the members of the Board and SVP breached their fiduciary duties by engaging in the Tender Offer and Squeeze-Out Merger. Those claims fail because the LLC Agreement contains a fiduciary duty waiver which provides that the members of the Board and SVP do not owe any fiduciary duties.

10

The Delaware Limited Liability Company Act (the "LLC Act") authorizes a limited liability company agreement to modify the duties (including fiduciary duties) that a member, manager, or other person otherwise would owe under common law. The operative language states:

> To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.

6 *Del. C.* § 18-1101(c). A provision eliminating fiduciary duties must be "plain and unambiguous." *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *9 (Del. Ch. Apr. 20, 2009).

The LLC Agreement contains a limited waiver of fiduciary duties for "Covered Persons," defined to include each "Manager or officer of the Company." *Id.* § 1.1. It states:

> Each Covered Person (other than any Covered Person who is an officer of the Company) shall, to the maximum extent permitted by the Act and other Applicable Law, owe no duties (including fiduciary duties) to the Members, the Owners, the Company or any other Person bound by this Agreement, notwithstanding anything to the contrary existing at law, in equity or otherwise[.]

*Id.* § 6.8(a) (the "Fiduciary Duty Waiver").

The Fiduciary Duty Waiver is plain and unambiguous. The plaintiffs have cited a string of provisions that supposedly create ambiguity, but none clouds its clarity or warrants detailed discussion. Because of the Fiduciary Duty Waiver, Counts II and III are dismissed.

11

**B.    Count I: Breach Of Fiduciary Duty Against The Officer Defendants**

In Count I of the Complaint, the plaintiffs contend that the Officer Defendants breached their fiduciary duties in connection with the Tender Offer and Squeeze-Out Merger. The LLC Agreement provides that officers of the Company "shall exercise such powers and perform such duties as are typically exercised by similarly titled officers in a corporation and as shall be determined from time to time by the Board, but subject in all instances to the supervision and control of the Board." LLCA § 6.3(h). With those powers come fiduciary duties.

By its express terms, the Fiduciary Duty Waiver does not protect the Officer Defendants. That provision extends to "[e]ach Covered Person (other than any Covered Person who is an officer of the Company)." LLCA § 6.8(a). Unlike the Board and SVP, the Officer Defendants cannot rely on the Fiduciary Duty Waiver.

**1.    Breach Of Duty In Connection With The Tender Offer**

The plaintiffs argue that the Officer Defendants breached their fiduciary duties because the Company provided no disclosures whatsoever in connection with the Tender Offer. That contention states a claim on which relief can be granted.[1]

---

[1] The defendants correctly point out that the six non-tendering plaintiffs lack standing to challenge the failure to make any disclosures in connection with the Tender Offer because (i) they did not tender and (ii) the Tender Offer did not inflict any injury on them, such as by changing the rights that SVP could exercise. *See New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 150 (Del. Ch. 2023). Two plaintiffs tendered, so the standing argument has no real-world, pleading-stage effect.

Officer duties have long been an undertheorized area of Delaware law. That is particularly so for the duty of disclosure, which is not a separate duty, but rather a contextual manifestation of the duties of care and loyalty. *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001). Because the duty of disclosure arises situationally, its scope and requirements depend on context. *Stroud v. Grace*, 606 A.2d 75, 85 (Del. 1992). When confronting a disclosure claim, a court therefore must engage in context-specific analysis to determine the source of the duty, its requirements, and any remedies for breach. *See* Lawrence A. Hamermesh, *Calling Off the Lynch Mob: The Corporate Director's Fiduciary Disclosure Duty*, 49 Vand. L. Rev. 1087, 1099 (1996).

"Governing principles have been developed for recurring scenarios." *In re Wayport, Inc. Litig.*, 76 A.3d 296, 314 (Del. Ch. 2013). One scenario that triggers a duty of disclosure is when directors ask stockholders to take action. If directors place a matter before the stockholders for a vote, then the directors have a duty to disclose all information material to that vote. Likewise, if directors propose a transaction that presents stockholders with an investment decision, such as a self-tender offer by the corporation or an affiliate, then the directors have a duty to disclose all information material to that investment decision. *Stroud*, 606 A.2d at 84; *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 16–17 (Del. Ch. 2014). For simplicity, this decision refers to this duty as the "stockholder-action duty."

In *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009), the Delaware Supreme Court implied that officers owe the stockholder-action duty. Addressing officer duties generally, the Delaware Supreme Court ruled as follows:

13

In dismissing Count I as to the Officer Defendants, the Court of Chancery similarly erred. The Court of Chancery has held, and the parties do not dispute, that corporate officers owe fiduciary duties that are identical to those owed by corporate directors. That issue—whether or not officers owe fiduciary duties identical to those of directors—has been characterized as a matter of first impression for this Court. In the past, we have implied that officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of directors. We now explicitly so hold.

*Id.* at 708–09.

The count that the Delaware Supreme Court addressed when holding that officers owe the same duties as directors was not a disclosure claim. Two other counts of the complaint, however, both involved alleged disclosure deficiencies in a proxy statement. *Id.* at 703. Those counts implicated the stockholder-action duty, and when analyzing those claims, the Delaware Supreme Court held that the allegations stated claims against all of the defendants, a term that included both directors and officers. The Delaware Supreme Court did not analyze the officer claims separately.

Relying on *Gantler*, this court has held that a complaint states a claim against an officer for breach of the stockholder-action duty when (i) the complaint's allegations supported an inference that the officer was involved in the drafting of the disclosure document, such as a proxy statement, and (ii) the officer took responsibility for the disclosure document by signing it or the disclosure violation fell within the officer's area

14

of responsibility.[2] At least under those circumstances, this court's precedents hold that an officer can breach the stockholder-action duty.

In this case, the defendants argue that SVP was the only party that could owe a duty of disclosure because SVP launched the tender offer. As they see it, only SVP requested investor action. Conveniently for the defendants, the LLC Agreement eliminated any fiduciary duties that SVP might have owed, including the duty of disclosure.

---

[2] *See Teamsters Loc. 237 Additional Sec. Benefit Fund v. Caruso*, 2021 WL 3883923, at \*25–26 (Del. Ch. Aug. 31, 2021) (holding that complaint stated claim for breach of the duty of disclosure against CEO who signed proxy statement where alleged misstatements concerned CEO's interactions with bidders, included the existence of activist pressure, the description of certain directors as independent); *In re Columbia Pipeline Group, Inc. Merger Litig.*, 2021 WL 772562, at \*56–58 (Del. Ch. Mar. 1, 2021) (holding that plaintiffs stated claim for breach of the duty of disclosure against CEO who signed proxy statement and against CFO/VP where disclosure violations concerned their interests in the transaction and their actions during the leadup to the transaction); *Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 288 (Del. Ch. 2021) (holding that CEO owed duty to disclose all material information in proxy statement in connection with a merger); *City of Warren Gen. Empls.' Ret. Sys. v. Roche*, 2020 WL 7023896, at \*19 (Del. Ch. Nov. 20, 2020) (holding that complaint stated claim for breach of the duty of disclosure against the CEO who signed the proxy statement for claims concerning acquisition projections, the description of how the go-shop operated); *In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at \*15 (Del. Ch. Oct. 27, 2020) (holding that complaint stated claim against CEO who signed proxy statement for claim concerning the omission of unaudited financial results); *Morrison v. Berry*, 2019 WL 7369431, at \*22–24 (Del. Ch. Dec. 31, 2019) (holding that complaint stated claim against general counsel for breach of the duty of disclosure where disclosure claims concerned the background of the transaction, it was reasonable to infer that general counsel was involved in the drafting of the Schedule 14D-9 and it was reasonable to infer that the general counsel knew about the alleged facts); *id.* at \*25–27 (same for CEO); *In re Hansen Med. Inc. S'holders Litig.*, 2018 WL 3025525, at \*11 (Del. Ch. June 18, 2018) (holding that complaint stated claim for breach of the duty of disclosure against CEO who signed proxy statement; also holding that complaint stated claim against interim CFO who allegedly prepared misleading projections).

15

In tender offers governed by the federal securities laws, federal law imposes a statutory duty on the target corporation's directors to provide their stockholders with material information, including a recommendation.[3] Delaware disclosure law piggybacks on the federal disclosure regime by layering on a state-law duty of full disclosure. *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del. 1994); *Matador Cap. Mgmt. Corp. v. BRC Hldgs., Inc.*, 729 A.2d 280, 295 (Del. Ch. 1998). No Delaware decision has held that the directors of a Delaware corporation have a duty of disclosure that applies in connection with a third-party tender offer when that that was not already subject to the federal regime. But Delaware courts also have not held that directors never have any obligation to speak in response to a tender offer. Such a position would seem extreme, because directors have an affirmative obligation to respond to threats to the corporation and its stockholders. *See Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985) (explaining that when a board of directors confronted a hostile tender offer, the board "is not a passive instrumentality" but rather has an obligation to protect the company's stockholders). If a controlling stockholder or third party makes a tender offer for the corporation's shares, then depending on the circumstances, the directors might well have a duty to respond. To the extent officers owe the same duties as directors, the duty could apply to them as well.

---

[3] 17 C.F.R. § 240.14e–2; *see* 15 U.S.C. § 78n(d)(4) (requiring compliance with the terms prescribed by the SEC whenever recommending that stockholders tender their shares); *id.* § 240.14d–9 (outlining the SEC's requirements for the 14D–9); *id.* § 240.14d–101 (Schedule 14D–9).

16

The Officer Defendants thus could have owed a duty of disclosure in connection with the Tender Offer. To the extent they owed a duty of disclosure, they breached it because they said nothing. But to the extent any such duty existed, the analysis also would also have to take into account the officer's duty of obedience. As an agent, an officer has an obligation to comply with directives from its principal or from more senior agents to whom the officers reports. *See generally Restatement (Third) of Agency* § 8.09 (Am. Law Inst. 2006), Westlaw, (database updated August 2023). Stated in the negative, an officer "may not act in a manner contrary to the express desires of the board of directors." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 754 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006). But the duty of obedience does not require compliance with directives that would expose an officer to criminal or civil sanctions or liability. *See Restatement of Agency*, supra, § 8.09 ("An agent has no duty to comply with instructions that may subject the agent to criminal, civil, or administrative sanctions or that exceed legal limits on the principal's right to direct action taken by the agent. Thus, an agent has no duty to comply with a directive to commit a crime or an act the agent has reason to know will be tortious."). "Thus, an officer does not have a duty to comply with directives that the officer has reason to believe would constitute a breach of fiduciary duty." *Goldstein v. Denner*, 2022 WL 1671006, at \*52 (Del. Ch. May 26, 2022)

These competing duties create a conundrum. It is reasonably conceivable that a duty of disclosure could exist in connection with a severely underpriced tender offer such that fiduciaries for the entity and its investors would have a duty to say something. It is reasonably conceivable that in the absence of the Fiduciary Waiver, both the Board and the

17

Officer Defendants could have owed that duty. The LLC Agreement only eliminated the Board's fiduciary duties, leaving the Officer Defendants' duties intact. If the Board made a decision against making any disclosure, then it would be difficult for the Officer Defendants to disregard that decision, unless the decision was so obviously wrong that compliance itself would constitute a breach of duty. But the Officer Defendants disclosed *nothing* in connection with the Tender Offer. In that setting, it is conceivable that the Officer Defendants may have had a duty to act.

The court cannot hash these issues out at the pleading stage. The plaintiff's claim is conceivable and therefore survives pleading-stage review. A motion for summary judgment, filed after the plaintiff has had an opportunity for discovery, may provide a more suitable vehicle for addressing the issues presented by this claim.

### 2. The Breach Of Duty In Connection With The Squeeze-Out Merger

The plaintiffs contend that the Officer Defendants breached their fiduciary duties in connection with the Squeeze-Out Merger because the Company provided paltry and inadequate disclosures. The Officer Defendants argue that no duty of disclosure existed because no one asked the Minority Unitholders to vote or make an investment decision. They also argue that any disclosure duty rested primarily on the Board, which owed no duties, and that the officers were not in a position to insist that the Board disclose more.

#### a. The Duty To Inform

The Officer Defendants' contention that no duty of disclosure existed fails to provide a basis for granting the motion. The duty of disclosure is a context-specific duty, and no Delaware decision holds that fiduciaries do not owe any duty in the context of a

18

transaction in which the fiduciaries unilaterally eliminates their investors from an enterprise. I personally am not prepared to rule as a matter of law that a fiduciary can take the property of its beneficiary without some level of disclosure, even in the absence of any request for action. To the contrary, basic fiduciary principles suggests that a fiduciary cannot do that.

"[T]he word 'fiduciary' is anglicized Latin, meaning trustee-like." Gregory Klass, *What if Fiduciary Obligations are like Contractual Ones?*, *in* Contract, Status, and Fiduciary Law 93 (Paul B. Miller & Andrew S. Gold, eds., 2016). "Fiduciary duties are thus obligations that are similar to those of a trustee, and a fiduciary relationship is one that is analogous to that between an express trustee and beneficiary." *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 545 (Del. Ch. 2023). Today, by statute, Delaware law authorizes a trust agreement to modify nearly every aspect of a trustee's duties. *See id.* The analysis of what baseline fiduciary duties require, however, does not start with that statutory scheme. It starts from the duties that existed at common law.

The obligation to keep beneficiaries informed is a central aspect of the trustee's duties at common law. George G. Bogert et al., *Bogert's The Law of Trusts and Trustees* § 544 at 659 (3d ed. 2020), Westlaw (database updated June 2023). "[E]ven in the absence of a request for information, a trustee must communicate essential facts" to beneficiaries. *McNeil v. Bennett*, 798 A.2d 503, 510 (Del. 2002). The trustee must ensure that beneficiaries are "reasonably informed of changes involving the trusteeship and about other significant developments concerning the trust and its administration, particularly material information needed by beneficiaries for the protection of their interests. Restatement

19

(Third) of Trusts § 82 (Am. L. Inst. 2007), Westlaw (database updated May 2023); *accord NHB Advisors, Inc. v. Monroe Cap. LLC*, 2013 WL 6906234, at \*4 (Del. Ch. Dec. 27, 2013).

The duty to keep beneficiaries informed imposes "an affirmative requirement that, if and as circumstances warrant over the course of administration, the trustee inform fairly representative beneficiaries of important developments and information that appear reasonably necessary for the beneficiaries to be aware of in order to protect their interests." Restatement of Trusts, *supra*, § 82 cmt. d. Notably, "[t]hese types of disclosures do not afford beneficiaries a right to veto trustee action," and they do not depend on the existence of a veto right. *Id.*; *see Matter of Wood,* 581 N.Y.S.2d 405, 409 (N.Y. App. Div. 2d Dept. 1992) (holding corporate trustee breached "the duty of communicating all the material facts to the beneficiary" before liquidating trust assets despite contention that trustee had authority to liquidate and followed bank's standard procedure); *Allard v. Pac. Nat. Bank*, 663 P.2d 104, 404–05 (Wash. 1983) (holding trustee had breached obligation to disclose "all material facts in connection with a nonroutine transaction which significantly affects the trust estate and the interests of the beneficiaries prior to the transaction taking place" when selling major asset despite beneficiaries not having power to stop transaction). Because "disclosure is fundamental to sound administration of the trust, and to both the trustee's performance and the beneficiaries' monitoring of associated fiduciary obligations," only clear language in a governing instrument can modify or limit this duty. Restatement of Trusts, *supra*, § 82 cmt. d.

The duty to inform is not limited to trustees. It "runs through the whole law of fiduciary and confidential relations." Bogert, *supra*, § 544 at 660–61.

In a commercial enterprise like the Company, the duty to inform is obviously more limited. The duty does not create a regular reporting obligation. *See Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 153 (Del. Ch. 2004). It could, however, mandate disclosure about extraordinary events.

If the duty to inform could apply anywhere, it would apply to a transaction in which a fiduciary unilaterally effectuates a taking of a beneficiary's interest. In that setting, the duty of loyalty could manifest as an obligation to inform the beneficiary of the material facts surrounding the transaction, regardless of whether or not the beneficiary's approval is required.

The Squeeze-Out Merger is a transaction where the duty to inform could apply. In substance, the defendants contend that they could have simply sent the plaintiffs a check with no explanation whatsoever. As far as the defendants are concerned, they did not even have to say, "Your shares have been converted into the right to receive this amount. So long." Such a result would be contrary to equity.

It is reasonably conceivable that a duty of disclosure existed in connection with the Squeeze-Out Merger.

### b. The Duty Not To Make Misleading Partial Disclosures

The Officer Defendants next reprise their argument that any duty of disclosure could only rest with the Board, such that the Officer Defendants had no duty to speak. As this decision has explained, it is reasonably conceivable that the duty of disclosure applies to

21

officers as well as defendants. That is particularly so for purposes of the Squeeze-Out Merger, because the Board and the Officer Defendants chose to speak when they issued the Disclosure Documents.

Under Delaware law, a fiduciary that chooses to speak must do so candidly and completely. *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996). "Once defendants travel down the road of partial disclosure, they have an obligation to provide an accurate, full, and fair characterization." *Id.* (cleaned up). The disclosures must cover the subject on which the fiduciary chose to speak "in a manner that is materially complete and unbiased by the omission of material facts." *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 448 (Del. Ch. 2002). Even if the additional information independently would fall short of the traditional materiality standard, it must be disclosed if necessary to prevent other disclosed information from being misleading. *Johnson v. Shapiro*, 2002 WL 31438477, at *4 (Del. Ch. Oct. 18, 2002).

When deciding whether information is material, Delaware law applies the federal standard from *TSC Industries, Inc. v. Northway, Inc.*, 426 U. S. 438 (1976). *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985). Information is material if there is a "substantial likelihood" that the information "'would have assumed actual significance in the deliberations' of a person deciding whether to buy, sell, vote, or tender stock." *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004) (quoting *Rosenblatt*, 493 A.2d at 944), *aff'd*, 872 A.2d 960 (Del. 2005) (TABLE). The test does not require that the information be so significant as to cause a reasonable investor to act differently. *Rosenblatt*, 493 A.2d at 944. Rather, the question is whether there is "a substantial likelihood that the disclosure

22

of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (cleaned up).

In two decisions issued while serving on this court, Chief Justice Strine addressed disclosure failures by fiduciaries that had provided stockholders in private companies with virtually no information. *See Nagy v. Bistricer*, 770 A.2d 43 (Del. Ch. 2000); *Turner v. Bernstein*, 776 A.2d 530 (Del. Ch. 2000). In *Turner*, the directors of a Delaware corporation also controlled a majority of the corporation's voting power, and they used their control to cause the company to sell itself to a third party, with the directors approving the transaction by written consent. 776 A.2d at 534. After the merger closed, the directors circulated an information statement that provided the stockholders with "extremely cursory information." *Id.* at 532. The directors "did not give the stockholders any current financial information or explain why the merger was in [their] best interests." *Id.* The stockholders "did not even receive the company's most recent financial results for the periods proximate to the vote," nor "any projections of future company performance," nor "any explanation of why the [company's] board believed that the merger consideration [should be accepted]." *Id.* at 535. The court granted summary judgment to the plaintiffs, holding that the duty to disclose all material information applied and that the directors "defaulted on this obligation" where they "did not even attempt to put together a disclosure containing any cogent recitation of the material facts pertinent to the stockholders' choice." *Id.* at 542.

In *Nagy*, the directors and controlling stockholders effected a merger between a corporation and an affiliate. 770 A.2d at 47. As in *Turner*, they distributed an information statement that provided minimal information. *Id.* at 48. The court noted that the document

(i) did not provide any financial information about the buyer or the seller; (ii) did not describe the process or events leading to the merger, (iii) did not describe why the seller's board had agreed to the merger, and (iv) contained no information regarding the fact that the seller's controllers held a controlling interest in the buyer. *Id.* Despite the lack of information, the defendants argued that the plaintiff had failed to state a disclosure claim. The court bluntly rejected that argument.

> This argument is fatuous. The Information Circular contains NO information from which [the plaintiff] would have any idea of the value of [the buyer] or [the seller]. The Information Circular contains NO information regarding the reasons [the defendants] supported the Merger as directors of [the seller], or the process that they used in coming to their decision to support the Merger. The Information Circular contains NO information regarding [the defendants' controlling] interest in [the buyer].

*Id.* at 60. The court granted summary judgment in favor of the plaintiffs, holding that "[i]nformation of this kind is self-evidently material." *Id.*

Here, the Board and the Officer Defendants chose to speak about the Squeeze-Out Merger. Once they issued the Disclosure Documents, they had a duty to provide the information that Delaware law requires.

The Disclosure Documents fell short of that standard. The Disclosure Documents contained no information concerning negotiations or the process leading up to the Squeeze-Out Merger. The Disclosure Documents also lacked any information concerning the Company's prospects or any reasons why $27.25 was an appropriate price for the Squeeze-Out Merger. It said that Reid received a fairness opinion from JLLS, but it did not include the opinion or provide a fair summary of its contents. The Disclosure Documents explained that the Independent Committee approved and recommended that the Board approve the

24

Squeeze-Out Merger, but it did not convey any of the Independent Committee's reasoning behind its recommendation. *See* Compl. Ex. D at 3. Similarly, the Disclosure Documents contained no information explaining why the Board had voted in favor of the Squeeze-Out Merger. The Disclosure Documents lacked any statements detailing the purported benefits of the Squeeze-Out Merger. Framed more generally, the Disclosure Documents disclosed *what* the Squeeze-Out Merger was, but did not disclose any information that would explain *how* the Company made this decision or *why* this was an appropriate course of action.

It is reasonably conceivable that once the Board and the Officer Defendants chose to speak about the Squeeze-Out Merger, they needed to provide significantly more information than they chose to disclose in the Disclosure Documents. It is reasonably conceivable that an investor would have viewed the omitted information as material. At this stage of the case, it is reasonable to infer that the disclosures in the Disclosure Documents were not sufficient.

Alternatively, the Officer Defendants argue that because the Company had emerged from bankruptcy months before, the bankruptcy disclosures provided all of the material information necessary to evaluate the Squeeze-Out Merger. To reach that conclusion at the pleading stage requires a defendant-friendly inference, contrary to the Rule 12(b)(6) standard, regarding the total mix of information. At the pleading stage, it is reasonable to infer that the bankruptcy disclosures were not sufficient.

### c. The Individual Officer Defendants

The Complaint seeks to hold Conlon, Yale, and Indest liable for breach of the duty of disclosure. As noted previously, this court has upheld claims for breach of the duty of

25

disclosure against officers when either the officer took responsibility for the disclosure document by signing it or the disclosure violation fell within the officer's area of responsibility. Under these standards, the Complaint states a claim against each of the Officer Defendants.

### i.    Conlon

Conlon serves as the Company's CEO. In that position, he is empowered to "exercise such powers and perform such duties as are typically exercised by similarly titled officers in a corporation[.]" LLCA § 6.3(h). It is reasonable to infer that in his capacity as CEO, Conlon participated significantly in the drafting of the Disclosure Documents. Conlon signed the letter sent to the Minority Unitholders, thereby taking responsibility for the contents of the Disclosure Documents. *See* Compl. Ex. C at 3.

As CEO, Conlon had firsthand knowledge of the facts plaintiffs claim should have been disclosed. He knew of SVP's proposal to squeeze out the Minority Unitholders in February 2022. He did not disclose SVP's proposal until June, when he signed off on the Disclosure Documents.

It is reasonable to infer that the Complaint states a claim for breach of the duty of disclosure against Conlon.

### ii.    Yale

Yale served as the Company's CFO at the time of the Squeeze-Out Merger. As CFO, Yale had the same powers and duties as a typical CFO of a Delaware corporation. LLCA § 6.3(h). It is reasonably conceivable that Yale, in his capacity as CFO, knew of SVP's proposal and was involved in the preparation of the Disclosure Documents. It is reasonable

26

to infer that as CFO, Yale was privy to information the Minority Unitholders would have found significant, including information about the background of the Squeeze-Out Merger, the negotiations with SVP, and the financial performance of the Company.

Yale's connection to deficient disclosures is one step removed from Conlon's because Yale did not sign the cover letter for the Disclosure Documents. Nevertheless, it is reasonable to infer that as CFO, Yale assisted in the drafting of the Disclosure Documents. If Yale contends that he had no involvement with the Disclosure Documents, he can move for summary judgment on that basis.

It is reasonable to infer that the Complaint states a claim for breach of the duty of disclosure against Yale.

### iii. Indest

Indest serves as the Company's Vice President of Finance and Chief Accounting Officer. The allegations against Indest track those against Yale. The same analysis applies.

### 3. The Breach Of Duty In Connection With The Financial Statements

Another context in which the duty of disclosure applies is when a fiduciary speaks through "public statements made to the market," "statements informing shareholders about the affairs of the corporation," or public filings required by the federal securities laws. *Malone*, 722 A.2d at 11 (Del. 1998). In that setting, the fiduciary owes "a duty to stockholders not to speak falsely." *Wayport*, 76 A.2d at 315. Fiduciaries "who knowingly disseminate false information that results in corporate injury or damage to [investors] violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances." *Malone*, 722 A.2d at 9; *accord id.* at 14 (explaining that if fiduciaries "are

27

not seeking shareholder action, but are deliberately misinforming shareholders about the business of the corporation, either directly or by a public statement, there is a violation of fiduciary duty.").

The plaintiffs contend that the Officer Defendants breached their duty of disclosure when sending annual and quarterly financial statements to the plaintiffs. That is a setting where fiduciary duties manifest as a duty not to speak falsely. The plaintiffs have not pled facts supporting an inference that anything in the financial statements was false. This aspect of Count I is dismissed.

## C. Counts IV and V: The Contract Claims

Next in line are the contract claims. Count IV asserts that the defendants breached explicit obligations set forth in the LLC Agreement. Count V asserts that the defendants breached implicit obligations supplied by the implied covenant of good faith and fair dealing. Those counts state claims on which relief can be granted.

Under the simplified pleading regime, when alleging a breach of contract, "a plaintiff need not plead specific facts to state an actionable claim." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003). At the pleading stage, it is sufficient to allege "first, the existence of the contract . . .; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *Id.* at 612. The reference to "resultant damage" is something of an overstatement. A claim for breach of contract can give rise to an equitable remedy even in the absence of quantifiable harm. *Universal Studios Inc. v. Viacom Inc.*, 705 A.2d 579, 583 (Del. Ch. 1997). And a court can vindicate a breach of contract through an award of nominal damages. *In re P3 Health Gp.*

28

*Hldgs., LLC*, 2022 WL 16548567, at \*9 (Del. Ch. Oct. 31, 2022) (collecting authorities). Alleging specific monetary harm is not a requirement.

The principal issue at the pleading stage is the existence of a contractual violation. *Garfield v. Allen*, 277 A.3d 296, 328 (Del. Ch. 2022). "A breach of contract gives rise to a right of action." 23 *Williston on Contracts* § 63:8 (4th ed. 2007), Westlaw (database updated May 2023). That is because any "unexcused failure to perform a contract is a legal wrong. An action will therefore lie for the breach although it causes no injury." 24 *Williston*, *supra*, § 64:9*; see Norman v. Elkin*, 860 F.3d 111, 128–29 (3d Cir. 2017).

### 1. Count IV: Breaches Of Express Provisions

In Count IV, the plaintiffs contend that the defendants breached express provisions of the LLC Agreement. When determining the scope of a contractual obligation, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotations omitted). "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). A contract is unambiguous "[w]hen the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation . . . ." *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462

29

(Del. Ch. 2008). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone-Poulenc*, 616 A.2d at 1196.

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). The Delaware Supreme Court has also instructed that "the basic business relationship between parties must be understood to give sensible life to any contract." *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 927 (Del. 2017). A reasonable reading therefore must be "situated in the commercial context between the parties." *Id.* at 926–27. But this principle cannot be used to override the plain language of the agreement: "While [Delaware courts] have recognized that contracts should be 'read in full and situated in the commercial context between the parties,' the background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement." *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018) (quoting *Chi. Bridge*, 166 A.3d at 926–27). "[I]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not." *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006).

### a. The Tender Offer And The No Acquisition Provision

The plaintiffs assert that the defendants breached the LLC Agreement by proceeding with the Tender Offer without complying with the No Acquisition Provision. The No Acquisition Provision prohibits SVP and its affiliates from engaging in a Squeeze-Out without first obtaining Specified Approval. That theory states a claim.

30

At the pleading stage, it is reasonable to infer that the Tender Offer constituted a Squeeze-Out because SVP reserved the right to purchase every tendered unit. SVP did not represent that it would not purchase all outstanding Stapled Units, nor did SVP otherwise bind itself to purchasing less than all outstanding Stapled Units. It is reasonable to infer that SVP wanted to purchase every tendered unit and, if it could, all outstanding Stapled Units. It is therefore reasonable to infer that the Tender Offer was a Squeeze-Out. The Offer to Purchase acknowledged the risk that the Tender Offer could be "considered a 'Squeeze-Out' as defined in the Limited Liability Company Agreement of the Company." Compl. Ex. H at 12.

SVP did not obtain Specified Approval for the Tender Offer. It is therefore reasonably conceivable that SVP breached the No Acquisition Provision by engaging in the Tender Offer.[4]

### b. Section 11.1(b) And The Financial Statements

The plaintiffs assert that the defendants breached Section 11.1(b) of the LLC Agreement, which provided Minority Unitholders with the right to timely GAAP-compliant annual and quarterly financial statements. The plaintiffs have pled claims for breach of that obligation.

---

[4] It also appears that by purchasing shares in the Tender Offer, SVP engaged in a Transfer without Specified Approval, which separately constitutes a violation of the No Acquisition Provision.

Under Section 11.1(b)(i) of the LLC Agreement, Minority Unitholders were entitled to GAAP-compliant annual financial statements "no later than one hundred twenty (120) days after the end of any calendar year." The deadline for the 2021 financial statements was April 30, 2021. The defendants did not make them available until May 24. Those allegations state a claim for breach of Section 11.1(b).

Under Section 11.1(b)(ii), the Minority Unitholders were entitled to GAAP-compliant quarterly financial statements no later than sixty days after the end of each of the first three quarters. The plaintiffs allege that the financial statements for Q1 2022 contain significantly less information than the financial statements for Q4 2021. It is reasonable to infer that successive quarterly financial statements prepared in accordance with GAAP would contain comparable information. The defendants argue that no claim can exist because the Q4 2021 financial statements are a financial report while the Q1 2022 financial statements are true financial statements. Section 11.1(b)(i) does not contemplate that distinction. The plaintiffs' allegations state a claim for breach of Section 11.1(b).

The plaintiffs further allege that the 2021 annual financial statements and the Q1 2022 financial statements did not contain all the information required by GAAP because they failed to disclose SVP's proposal for the Squeeze-Out Merger. The plaintiffs have not identified an aspect of GAAP that would call for this disclosure. The plaintiffs have not stated a viable claim for breach on that basis.

The defendants try to defeat the two viable claims of breach by asserting that the plaintiffs failed to plead any cognizable damages. "A party need not plead cognizable damages as an element of a claim for breach of contract" because the court "can vindicate

32

a breach of contract through an award of nominal damages." *P3 Health*, 2022 WL 16548567, at \*9, \*30 (collecting authorities). The plaintiffs have plead a claim for breach of Section 11.1(b).

### c. The Squeeze-Out Merger And The No Acquisition Provision

Based on a representation that the defendants made in their opening brief, the plaintiffs assert that the Squeeze-Out Merger violated the No Acquisition Provision. The defendants stated that when the Squeeze-Out Merger took place, there were two Independent Managers: Reid and Hawkins. Manager Approval requires the approval of a majority of the Independent Managers. The Squeeze-Out Merger only received approval from Reid. The Squeeze-Out Merger therefore did not receive approval from a majority of the Independent Managers.

Because Reid's approval does not satisfy the requirements for Manager Approval, the Squeeze-Out Merger only could comply with the No Acquisition Provision if it received Minority Approval. No one suggests that it did. It is therefore reasonably conceivable that the Squeeze-Out Merger did not comply with the No Acquisition Provision.

### 2. Count V: Breach Of The Implied Covenant Of Good Faith And Fair Dealing

In addition to asserting claims for breach of explicit provisions, the plaintiffs assert claims for breach of implicit obligations supplied by the implied covenant of good faith and fair dealing. A claim for breach of the implied covenant is a claim for breach of

33

contract. The only difference is the source of the provision. The plaintiffs have stated claims for breach.

The application of the implied covenant is a "cautious enterprise." *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010). The implied covenant is "not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract." *Id.* at 1128. "Even where the contract is silent, an interpreting court cannot use an implied covenant to re-write the agreement between the parties, and should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it." *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2019).

The Delaware Supreme Court has exhorted trial courts to use particular caution when applying the implied covenant to alternative entity agreements. In a series of decisions, the Delaware Supreme Court has stressed that when plaintiffs have invested in an alternative entity where the agreement waives fiduciary duties, then the plaintiffs accepted the risks associated with a purely contractual relationship. For example, the Delaware Supreme Court has quoted the observation that "'the doctrine of caveat emptor . . . is fitting given that investors in limited partnerships have countless other investment opportunities available to them that involve less risk and/or more legal protection.'" *Boardwalk Pipeline P'rs, LP v. Bandera Master Fund LP*, 288 A.3d 1083, 1110 (Del. 2022) (quoting *Sonet v. Timber Co., L.P.*, 722 A.2d 319, 323 (Del. Ch. 1998)). And the Delaware Supreme Court has highlighted the fact that the plaintiff "willingly invested in a

34

limited partnership that provided fewer protections to limited partners than those provided under corporate fiduciary duty principles." *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 368 (Del. 2013). In yet another decision, the Delaware Supreme Court offered a warning:

> With the contractual freedom accorded partnership agreement drafters, and the typical lack of competitive negotiations over agreement terms, come corresponding responsibilities on the part of investors to read carefully and understand their investment. Investors must appreciate that "with the benefits of investing in alternative entities often comes the limitation of looking to the contract as the exclusive source of protective rights." In other words, investors can no longer hold the general partner to fiduciary standards of conduct, but instead must rely on the express language of the partnership agreement to sort out the rights and obligations among the general partner, the partnership, and the limited partner investors.

*Dieckman v. Regency GP LP*, 155 A.3d 358, 366 (Del. 2017)

In this case, the context is different. The plaintiffs bought shares in a corporation. They ended up owning Stapled Units in a Delaware LLC only after SVP acquired a majority of their corporation's Senior Notes, engineered a Chapter 11 filing without the Company ever defaulting on the Senior Notes, and pushed through a plan under which the Company emerged in its current incarnation. To the extent that the concept of *caveat emptor* has informed past cases, that factor does not apply here. At least at the pleading stage, that suggests somewhat greater room exists for the implied covenant to conceivably operate.

### a. The Standard For Determining Whether An Implied Commitment Exists

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205 (Am. L. Inst.

35

1981), Westlaw (database updated May 2023). The Delaware Supreme Court has summarized the implied covenant concisely as follows:

> The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that . . . neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting.

*Dieckman*, 155 A.3d at 367 (cleaned up). To prevail on an implied covenant claim, a plaintiff must prove "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Cantor Fitzgerald, L.P. v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998). Those elements parallel a claim for breach of an express contract provision, except that the operative provision is implied.

To determine whether an implicit obligation exists, a court "first must engage in the process of contract construction to determine whether there is a gap that needs to be filled." *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (ORDER). "Through this process, a court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill." *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014). The court must first find a gap because "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right." *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010). "[B]ecause the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the

36

agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue." *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) (ORDER).

"If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap. Not all gaps should be filled." *Allen*, 113 A.3d at 183. One reason a gap might exist is if the parties negotiated over a term and rejected it. Under that scenario, the implied covenant should not be used to fill the gap left by a rejected term because doing so would grant a contractual right or protection that the party "failed to secure . . . at the bargaining table." *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004), *aff'd*, 861 A.2d 1251 (Del. 2004).

But contractual gaps may exist for other reasons. "No contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency." *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008). "In only a moderately complex or extend[ed] contractual relationship, the cost of attempting to catalog and negotiate with respect to all possible future states of the world would be prohibitive, if it were cognitively possible." *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.).

Equally important, "parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations." *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.) (quoting *Corbin on Contracts* § 570, at 601 (Kaufman Supp. 1984)). "The implied covenant is well-suited to

37

imply contractual terms that are so obvious . . . that the drafter would not have needed to include the conditions as express terms in the agreement." *Dieckman*, 155 A.3d at 361.

"The implied covenant seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them." *Id.* at 418 (cleaned up). When applied to an exercise of discretion, this means that the exercise of discretionary authority must fall within the range of what the parties would have agreed upon during their original negotiations, if they had thought to address the issue.

### i. Disclosures Of Information

The plaintiffs argue that the defendants were under an implied obligation to disclose information about the Tender Offer and the Squeeze-Out Merger. The plaintiffs assert that the defendants had an obligation to do so generally and so that holders of Stapled Units could determine whether they could exercise the Challenge Right. The defendants argue that alleged disclosure violations cannot support an implied covenant claim because Section 11.1(b) of the LLC Agreement specifies the information that the Minority Unitholders had a right to receive. They argue that the Challenge Right did not apply to the Tender Offer because it was not a Squeeze-Out and did not apply to the Squeeze-Out Merger because Reid approved the transaction as the Minority Approved Independent Manager.

At the pleading stage, these arguments fail under *Dieckman*. There, a limited partnership engaged in a squeeze-out merger after obtaining "Special Approval" from a committee using a procedure comparable to Manager Approval. The limited partnership

38

issued an information statement in connection with the transaction, and minority limited partners filed suit. The limited partnership agreement eliminated all fiduciary duties, and like the defendants here, the *Dieckman* defendants argued that they had no contractual obligation under Delaware law to provide any information other than what the limited partnership agreement specified. The Delaware Supreme Court disagreed, holding that the implied covenant obligated the defendants to provide truthful and accurate disclosure of material information. *Dieckman*, 155 A.3d at 367–68.

It is reasonably conceivable that the disclosure issued in connection with the Tender Offer and Squeeze-Out Merger violated the implied covenant. That claim survives dismissal.

### ii.     The Choice To Seek Manager Approval

The plaintiffs next argue that the defendants breached the implied covenant by choosing to seek Manager Approval from Reid when he was not capable of acting independently of SVP. As evidence of Reid's lack of independence, the plaintiffs cite his refusal to speak with one of the plaintiffs—a minority holder of Stapled Units—even though the LLC Agreement designated Reid as the Minority Approved Independent Manager. They also cite evidence that his livelihood depends on maintaining good relations with firms like SVP.

The Delaware Supreme Court has made clear that the implied covenant constrains a party's exercise of discretion under an agreement. The implied covenant generally requires that a party to a contract refrain from arbitrary or unreasonable conduct that has the effect of preventing a counterparty from receiving the fruits of the bargain. That rule

39

operates with special force "when a contract confers discretion on a party." *Glaxo Gp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021). At a minimum, the implied covenant requires that the party empowered with the discretion "use good faith in making that determination." *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990). Terms that enhance the level of discretion, such as "sole discretion," do not eliminate the implied duty. *Miller v. HCP Trumpet Invs., LLC*, 194 A.3d 908, 2018 WL 4600818, at *1 (Del. Sept. 20, 2018) (ORDER) ("[T]he mere vesting of 'sole discretion' did not relieve the [holder] of its obligation to use that discretion consistently with the implied covenant of good faith and fair dealing."). When a party has sole discretion to make a decision, "[t]hat setting provides more reason for the implied covenant to apply, not less." *P3 Health*, 2022 WL 16548567, at *26.

What does it mean to exercise discretion "in good faith" for purposes of the implied covenant? It does not mean that a reviewing court introduces its own notions of what is "fair or reasonable under the circumstances." *Allen*, 113 A.3d at 184. When used with the implied covenant, the term "good faith" contemplates "faithfulness to the scope, purpose, and terms of the parties' contract." *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 419 (Del. 2013) (cleaned up), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013). The concept of "fair dealing" similarly refers to "a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose." *Id.* (cleaned up). The court must attempt to discern "what the parties would have agreed upon had the issue arisen when they were bargaining originally." *Id.* (cleaned up).

40

Applying these principles, the Delaware Supreme Court has held that inherent in a conflict resolution procedure like the No Acquisition Provision is an obligation that the managers of the entity "not act to undermine the protections afforded unitholders . . . ." *Dieckman*, 155 A.3d at 360. The Delaware Supreme Court held that it inferably violated to implied covenant to "subvert the Special Approval process by appointing conflicted members . . . ." *Id.*

When SVP proposed the Squeeze-Out Merger, the Board had discretion over how to comply with the No Acquisition Provision. The Board had a choice between Manager Approval and Minority Approval. The plaintiffs contend that if the parties had been able to bargain over that decision, they never would have agreed that SVP could seek Manager Approval from an Independent Manager who (i) joined the SVP-affiliated members of the Board in remaining silent throughout the Tender Offer, (ii) who was not willing to speak with one of the Minority Unitholders, and (iii) owes his livelihood to maintaining good relations with firms like SVP. Other pertinent factors identified in the Complaint include the absence of any prior disclosure of the Squeeze-Out Merger to the Minority Unitholders, the paltry after-the-fact disclosures made to the Minority Unitholders, and the inferably glaring inadequacy of the price. It is reasonably conceivable that in the original bargaining position, the parties would not have agreed that Manager Approval could be used under those circumstances.

The defendants try to recast the plaintiffs' argument as an implied obligation to seek Minority Approval, and they point out that the No Acquisition Provision expressly contemplates either Manager Approval *or* Minority Approval. The plaintiffs are not

41

contending that there is an obligation to seek Manager Approval. They are contending that the obvious intent of the No Acquisition Provision is to provide protection for Minority Unitholders and that it violates the spirt of that provision to empower Reid to provide Specified Approval under the pled facts. The defendants answer that response by stating that the LLC Agreement does not impose any express limitations on the circumstances when either path for Specified Approval can be used, but the answer to that is, "Precisely." The absence of any express limitation is what creates a gap in the No Acquisition Provision. The LLC Agreement provides the Board with discretion over which path to take, and the implied covenant requires that the Board exercise that discretion reasonably.

In a last-ditch effort to avoid an implied covenant claim, the defendants fight with the pled facts. They ask for a defendant-friendly inference by asserting that it is not reasonable to infer a breach of the implied covenant when (i) the LLC Agreement designated Reid as the Independent Manager, (ii) he received a fairness opinion from JLLS, and (iii) the consideration offered in the Squeeze-Out Merger was approximately 10% higher than the Tender Offer price. Those contentions are not dispositive. The largest judgment in this court's history resulted from a transaction that was negotiated for eight months by an independent special committee that received a fairness opinion. *See Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1219 (Del. 2012). The fact that the LLC Agreement designated Reid as the Independent Manager does not mean that he was independent in fact or acted independently. A bare fairness opinion has little value: It consists of one conclusory sentence plus a host of disclaimers. No one has seen the fairness opinion, much less any underlying analysis. And the fact that SVP upped its price by 10%

42

over a unilateral tender offer that failed to garner the level of interest that SVP targeted does not say anything about the fairness of the price. At the pleading stage, the court must assume that the plaintiffs' facts are true and give the plaintiffs the benefit of all reasonable inferences.

### iii. Price Inadequacy In The Squeeze-Out Merger

The plaintiffs finally argue that the defendants breached the implied covenant in connection with the Squeeze-Out Merger because the consideration was so low. It is reasonable to infer that the implied covenant would supply a standard equivalent to waste, under which a party would breach the implied covenant by imposing a price that is so extreme that no rational person would agree to it. The plaintiffs have pled facts that support such a claim. At the pleading stage, taking the Complaint's allegations as true, it is reasonably conceivable that the consideration in the Squeeze-Out Merger was so low that it violated the implied covenant.

### 3. The Parties Responsible For The Breach

Counts IV and V both state claims for breach of the LLC Agreement. The members of the Board and SVP are parties to the LLC Agreement, so at the pleading stage, the claims for breach of the LLC Agreement state claims against them. The defendants attempt to parse who might be responsible for what obligation at the pleading stage, but the court will not engage in that type of analysis at this point in the case.

The Officer Defendants contend that a claim for breach of contract cannot lie against them because they are not parties to the LLC Agreement. They assert that proposition as if

43

it were self-evident, but an LLC Agreement is both a contract and a constitutive document of the entity. It is the principal document that governs the Company's internal affairs.

I am not prepared to rule peremptorily that an officer of an LLC is not bound by its LLC agreement, even if the officer is not a signatory to the document. Under the LLC Act and associated common law doctrine, an officer of an LLC can be a *de facto* manager.[5] Managers are bound by an LLC agreement. *See* 6 *Del. C.* § 18-101(9) ("A member or manager of a limited liability company or an assignee of a limited liability company interest is bound by the limited liability company agreement whether or not the member or manager or assignee executes the limited liability company agreement."). Both modern and venerable corporate authorities hold that an officer is bound by a corporation's constitutive documents, such as its bylaws.[6] That suggests that the Officer Defendants could be bound

---

[5] *See, e.g.*, *Metro Storage Int'l LLC v. Harron*, 2019 WL 3282613, at *11 (Del. Ch. July 19, 2019); *Phillips v. Hove*, 2011 WL 4404034, at *22 (Del. Ch. Sept. 22, 2011); *PT China LLC v. PT Korea LLC*, 2010 WL 761145, at *5 & n.25 (Del. Ch. Feb. 26, 2010).

[6] *E.g.*, 8 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 4197 at 802–04 (perm ed., rev. vol. 2011), Westlaw (database updated Sept. 2022) ("Bylaws are defined as private laws of the corporation . . . . The corporation, and its directors and officers, are bound by and must comply with them."); Robert Charles Clark, *Corporate Law* § 3.3 at 115 (1986) (explaining that officer is bound by limits on express authority "in the corporation's bylaws or in resolutions of the board" and noting that "[m]ost corporations' bylaws list the officer positions and describe, in a general way, what each officer's powers are to be"); Henry Winthrop Ballantine, *Ballantine on Corporations* § 65 at 167 (Rev. ed. 1946) (explaining that directors and officers are bound by limitations in the charter and bylaws but that the better view is that they are not liable if they violate those limitations in good faith and non-negligently); Joseph Kinnicut Angell & Samuel Ames, *Treatise of the Law of Private Corporates Aggregate* § 359 at 363 (7th ed. Rev. 1861) (citing *Bank of Wilm. & Brandywine v. Wollaston*, 3 Del. 90, 94 (Del. Super. Ct. 1840)); *see also* Ernest L. Folk, III, *The Delaware General Corporation Law: A Commentary and Analysis* 71 (1972) (noting that under Delaware law, the bylaws generally

by the LLC Agreement. At the pleading stage, the claims for breach of the LLC Agreement survive as to all defendants.

## D.    The Exculpation Provision

The LLC Agreement contains an exculpatory provision that states:

> No Covered Person shall be liable to the Company or to any Owner or Member for any loss or damage sustained by the Company or any Owner or Member, unless it is determined in a final, non-appealable judgment of a court of competent jurisdiction that the loss or damage shall have been the result of such Covered Person's Malfeasance.

LLCA § 10.1(b) (the "Exculpation Provision"). Each of the defendants is a Covered Person. *See id.* § 1.1 (definition of "Covered Person"). Unlike the Fiduciary Duty Waiver, the Exculpation Provision does not a carve out officers.

The LLC Agreement defines "Malfeasance" self-referentially as "knowing fraud or willful malfeasance." *Id.* (definition of "Malfeasance"). "Malfeasance" means "[a] wrongful, unlawful, or dishonest act[.]" *Malfeasance*, Black's Law Dictionary (11th ed. 2019). "Malfeasance" is a synonym for "misconduct," which refers to "unlawful, dishonest, or improper behavior." *Misconduct*, in *id.* "Willful misconduct" is misconduct "committed voluntarily and intentionally." *Id.* "Willful" conduct is "not necessarily malicious." *Willful*, in *id.* This court has interpreted "willful misconduct" as "intentional wrongdoing, not mere negligence, gross negligence or recklessness," but which involves either malicious conduct or "conduct designed to defraud or seek an unconscionable

---

set out the powers and duties of officers and that officers are constrained by those designations).

advantage." *Dieckman v. Regency GP LP*, 2021 WL 537325, at \*36 (Del. Ch. Feb. 15, 2021), *aff'd*, 264 A.3d 641 (Del. 2021).

When determining "whether an actor engaged in willful misconduct" at the pleading stage, "the trial court must draw reasonably conceivable inferences in favor of the plaintiff based on what the allegations of the complaint suggest, recognizing that it may be virtually impossible for a plaintiff to sufficiently and adequately describe the defendant's state of mind at the pleading stage." *W.D.C. Hldgs., LLC v. IPI P'rs, LLC*, 2022 WL 2235005, at \*10 (Del. Ch. June 22, 2022). At this stage, it is enough that Malfeasance is reasonably conceivable.

The defendants argue that the plaintiffs have not plead facts sufficient to support an inference that any of them engaged in intentional wrongdoing. A defendant's state of mind, including a person's knowledge or intent, "may be averred generally." *Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 158 (Del. Ch. 2003); *see* Ct. Ch. R. 9(b). The degree to which a party must plead facts also takes into account whether "the facts lie more in the knowledge of the opposing party than of the pleading party." *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 146 (Del. Ch. 2003).

The Complaint alleges facts supporting a reasonable inference that each defendant intentionally pursued a scheme to eliminate the Minority Unitholders at a grossly unfair price. The Complaint identifies reasons to think that the value of the Stapled Units was at least twice the value of the consideration provided in the Tender Offer and Squeeze-Out Merger and potentially as much as four times greater. *Cf. Morris v. Spectra Energy P'rs (De) GP, LP*, 2017 WL 2774559, at \*14–16 (Del. Ch. June 27, 2017) (holding that 33%

46

difference between transaction price and actual value supported inference of subjective bad faith). The scheme inferably violated provisions of the LLC Agreement and the Officer Defendants' fiduciary duties. The defendants cannot rely on the Exculpation Provision at this phase of the case.

### E.    Counts V and VI: Aiding And Abetting Against The Board And SVP

The plaintiff asserts that the members of the Board and SVP aided and abetted the breaches of fiduciary duty by the Officer Defendants. The court will not analyze those claims at the pleading stage.

"A party does not have a right to a pleading-stage ruling at the start of a case." *Harris*, 289 A.3d at 342; *see Spencer v. Malik*, 2021 WL 719862, at \*5 (Del. Ch. Feb. 23, 2021); *see also In re Pattern Energy Gp., Inc. S'holders Litig.*, 2021 WL 1812674, at \*46 & n.612 (Del. Ch. May 6, 2021). Rule 12(a)(1) allows a court to defer the decision of a pleading-stage motion until a later point, including the trial on the merits. Ct. Ch. R. 12(a)(1) ("If the Court denies the motion or postpones its disposition until the trial on the merits, the responsive pleadings shall be served within 10 days after notice of the Court's action."). Rule 12(d) reiterates that authority, noting that a court should address a Rule 12(b)(6) motion in a preliminary hearing "unless the court orders that the hearing and determination thereof be deferred until the trial." Ct. Ch. R. 12(d). A trial court can also determine when to address an issue using its inherent authority to control its docket. *See Harris*, 289 A.3d at 342–43.

There can be significant value in dispensing with meritless claims at the pleading stage. But a court need not examine the sufficiency of every count in a complaint or

consider every argument that a defendant has advanced. That is particularly true when an issue will not result in the dismissal of a defendant from the case and where the case involves a common nucleus of operative fact that will be the focus of discovery in any event. In that setting, the case can readily proceed past the pleading stage.

Here, the Complaint states at least one claim for relief against each defendant. The dispute concerns a common nucleus of operative fact, such that rulings on the aiding and abetting claims will not narrow or expand the scope of discovery. No one will suffer prejudice from the absence of a pleading-stage assessment. Given that context, there is no reason at this point for the court to engage in additional analysis of the claims. Even if the court dismissed them, the dismissal would be interlocutory and could be revisited, subject to the law of the case doctrine, for good cause shown. The court therefore will defer ruling on the aiding and abetting claims.

### III.    CONCLUSION

The defendants' motion to dismiss is granted in part. Count I is dismissed to the extent it relies on the financial statements. Counts II and III are dismissed in their entirety. Other counts are limited to the extent set forth in this decision. Otherwise, the motion to dismiss is denied.